# United States Court of Appeals
## For the First Circuit

Nos. 21-1086, 21-1087

ESTATE OF USAAMAH ABDULLAH RAHIM, by Rahimah Rahim, in her
capacity as Personal Representative of the Estate of Usaamah
Abdullah Rahim,

Plaintiff, Appellee,

v.

JOHN DOE 1; JOHN DOE 2,

Defendants, Appellants,

UNITED STATES,

Defendant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Indira Talwani, U.S. District Judge]

Before

Barron, Chief Judge,
Lynch and Gelpí, Circuit Judges.

Joseph B. Simons, with whom Sara Attarchi and Simons Law
Office were on brief, for appellee.
Daniel Aguilar, Attorney, Appellate Staff, Civil Division,
with whom Brian M. Boynton, Acting Assistant Attorney General,
Joshua S. Levy, First Assistant United States Attorney, and Mark
B. Stern, Attorney, Appellate Staff, Civil Division, were on brief,
for appellant John Doe 1.
Nicole M. O'Connor, Senior Assistant Corporation Counsel, for
appellant John Doe 2.

October 20, 2022

**LYNCH**, **Circuit Judge**. FBI Special Agent John Doe 1 and Boston Police Department Detective John Doe 2, members of the FBI's Joint Terrorism Task Force (the "Task Force"), appeal from a district court's denial of their pre-discovery motions for summary judgment on qualified immunity grounds. The officers shot and killed a terrorist suspect on June 2, 2015, in Boston's Roslindale neighborhood. Plaintiff Rahimah Rahim, the representative of the decedent's estate (the "Estate"), sued, alleging that the officers' use of lethal force violated the Fourth Amendment and asserting various claims under state law.

The district court found that the officers would be entitled to qualified immunity if it considered only the moment of the shooting. But it denied summary judgment and authorized discovery on the theory that the proper focus was not just on the encounter itself but on the officers' plans and actions in the lead-up to the encounter. We reverse.

## I.

### A.

The following facts are not in dispute. In the spring of 2015, decedent Usaamah Rahim was being investigated by the Task Force for connections to the Islamic State of Iraq and the Levant ("ISIL"), a foreign terrorist group. Officers Doe 1 and Doe 2 were involved in this investigation.

As part of the investigation, the Task Force conducted electronic and physical surveillance on Rahim and on David Wright and Nicholas Rovinski, believed to be Rahim's coconspirators. Cf. United States v. Wright, 937 F.3d 8, 13, 32-37 (1st Cir. 2019) (affirming Wright's conviction for conspiracy to commit acts of terrorism transcending national boundaries in violation of 18 U.S.C. § 2332b(a)(2) and (c)). The Task Force monitored calls among the three men.

On June 2, 2015, at 5:18 a.m., Task Force officers (likely not the defendants) intercepted a call between Rahim and Wright, both located in the Boston area. Rahim told Wright that he (Rahim) "was losing [his] intention" and thus "must act sooner than anticipated." He could no longer wait for the "things" that were "gonna . . . go down" in New York on the Fourth of July. Instead of traveling to New York, his plans were "local" and immediate: he would go on "vacation" "right here in Massachusetts." He planned to "go[] after . . . those boys in blue" because they were the "easiest target." Rahim had already given his "bi'ah [allegiance]," and thus this would be more than simply a "vigilante attack." The attack would be "random" and "might even happen today." "[I]f not today, then tomorrow . . . ." Rahim expressed his belief that "Jihad is a way out . . . of this dunayh [worldly life]" and discussed plans to empty his bank account and prepare a will.

Around 6:00 a.m. that morning, Doe 1, Doe 2, and other Task Force officers gathered in a CVS parking lot near Rahim's apartment in the Roslindale neighborhood of Boston to conduct a surveillance shift. Around this time, a Task Force supervisor notified the surveillance team of Rahim's conversation with Wright and instructed Doe 2 that Rahim had to be stopped from boarding any public transportation. Doe 2 was aware that Rahim rode a public bus from a stop in front of the CVS on Washington Street, less than a five-minute walk from Rahim's apartment. Doe 2 relayed the supervisor's order to other members of the surveillance team and asked them to assemble at Doe 2's vehicle in the CVS parking lot to develop a plan to prevent Rahim from boarding the bus.

An unidentified officer then asked police dispatch to "start a few marked cars" to Rahim's neighborhood. The officer continued: "[W]e need some detectives. We're going to stop a guy armed with a knife. . . . [W]e have a gentleman, a black male, 6 feet, beard, 240, 20s, going to be coming out now armed with a knife. The detectives are going to stop him. If we can get a few marked cars in there to assist." Rahim met that description. As the backup units headed toward Rahim's neighborhood, the officer requested that they "be in the area" but "stay back" and turn off their lights and sirens. He then requested that the backup units

> stay just short of the Burger King and keep an
> eye in [sic] the bus stop that's right in front
> of the CVS sign. If our subject is making his

way here now, we're going to take him out at that spot. We'll just need them to come up for backup. It will be plain clothes units, about four, taking a black male right in front of that bus stop, and that should be happening in the next few minutes.

Shortly after 7:00 a.m., the surveillance team watched Rahim leave his apartment and walk toward the nearby bus stop on Washington Street. As Rahim walked toward the bus stop, he placed a call on his cell phone, speaking first with his brother, Muhammad Rahim, and then with his father, Abdulla Rahim. Rahim told his brother: "Unfortunately, you will not be seeing me again." The record does not reveal whether the officers planning to intercept Rahim were aware of the contents of this conversation. As Rahim approached the bus stop, still on the phone, he was approached by Doe 1, Doe 2, and other members of the surveillance team. The record is unclear as to whether the officers identified themselves and whether they approached with their weapons already drawn.[1]

---

[1] The Estate presents an unsupported argument, contrary to the witness statements it presented in opposition to summary judgment, that the officers approached Rahim with guns drawn and did not identify themselves, a position the district court adopted on the basis that the officers were in plainclothes and Rahim's initial response was "Do I know you?"

The Estate's own evidence is that several civilian witnesses understood the officers to be law enforcement officials. One of these witnesses also stated that the officers did not draw their weapons until after they commanded Rahim to put his hands up. The Estate's argument is not supported by the record. Further, even if the argument had any record support, which it does not, the officers would still be entitled to immunity.

Rahim's cell phone captured audio of the ensuing confrontation[2]:

Officer: "Put your hands up please."

Rahim: "Do I know you?"

Officer: "Put your hands up!"

Officer: "Put your hands up [unintelligible]."

Officer: "Drop it!  Drop it right now!"

Rahim: "Why don't you drop yours?"

Officer: "Drop it!"

Rahim: "Why don't you drop yours?"

Officer: "Drop it!"

Rahim: "Why don't you drop yours?"

Officer: "Drop it!"

Rahim: "Why don't you drop yours?"

Officer: "Drop it!"

Rahim: "Drop yours!"

Officer: "Drop it!"

Rahim: "Drop yours!"

Officer: [Unintelligible]

Rahim: "Drop yours!"

Rahim: "Drop yours!"

Officer: [Unintelligible]

_____

[2]    The Estate does not contest that Rahim's phone accurately captured audio of the encounter.

Officer: [Unintelligible]

Rahim: "[Unintelligible] over here. Come on!
Won't you shoot me?"

[Shots]

Throughout this exchange, Rahim advanced on the officers and the officers retreated to maintain distance. Civilian witnesses described Rahim as "not look[ing] like he was going to stop" and at least one of the officers as appearing fearful. The officers retreated backward across much of the CVS parking lot until they were up against a curb at the edge of the lot. Rahim kept advancing and came within twenty-five feet of the officers. Just seconds before the shooting, Rahim had refused to put his hands up, had refused to drop what was in his hand, had taunted the officers telling them to drop what was in their hands, and had taunted them more with his "Come on!" statement. An objective officer would conclude Rahim had chosen to escalate the situation and that Rahim was an increasing threat. And Rahim's actions were consistent with his words: he kept advancing on the officers, despite their attempts by retreating to not let him close the distance. When he had come close enough to them to be a lethal threat to the officers and others, they had split-second decisions to make about what was needed to stop him. And two officers almost simultaneously reached the same decision. Doe 1 fired twice and

Doe 2 fired once.  Rahim was hit.  The entire encounter unfolded over about thirty seconds.

After Rahim went down, the officers removed something from his hand and tossed it away from him.  One of the officers stood guard over this object while the others performed first aid on Rahim.

The Boston Police Department later processed an Ontario Knife Company Model SP6 Fighting Knife -- thirteen inches long with an eight-inch blade -- submitted for a post-incident criminalistics report.  The EMTs who responded to the scene also found a knife sheath in their ambulance after delivering Rahim to the hospital.  The sheath, from which no latent prints were recovered, appeared to be for a blade that was at least six inches long.  Rahim had been the only patient in the ambulance.

**B.**

The Estate sued Doe 1, Doe 2, and the United States on May 31, 2018, alleging that the officers' actions violated Rahim's Fourth Amendment rights under <u>Bivens</u> v. <u>Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971), and asserting state law negligence, wrongful death, assault, and battery claims.[3] The Estate's operative complaint does not allege that Rahim was

---

[3]    Although Doe 2 was a Boston Police Department Detective at the time of the events at issue, he was working as a member of a federal task force.  The parties and the district court thus treated <u>Bivens</u> as the applicable framework.

unarmed during the encounter. The complaint refers to the officers' belief that Rahim was armed and planned to carry out a terrorist attack:

- "Despite [the Task Force's] belief that Mr. Rahim planned to kill someone and had bought three (3) large knives to use in an alleged planned killing, there were no criminal charges or warrants against Mr. Rahim."

- "At the time of [an alleged] meeting, the FBI and members of the [Task Force] were already under the impression and belief that the (3) individuals were conspiring to commit an act of terror, on one or more individuals, and providing material support and resources, and/or personnel services to a foreign terrorist organization, namely ISIL."

- "Investigators allegedly believed that in preparation for an attack, Mr. Rahim had purchased three (3) military-style knives. . . . The [Task Force] allegedly believed that the knives were going to be used to kill a particular person."

- "According to the Suffolk County District Attorney's Report, the [Task Force] believed that Mr. Rahim would be armed with a knife when he left home again."

- "The Suffolk County District Attorney's Report alleges that Mr. Rahim was holding a military style knife."

The government moved for summary judgment before discovery on the grounds that Doe 1 and Doe 2 were entitled to qualified immunity.[4]  In support of these motions, the government offered sworn statements from Doe 1, Doe 2, and three other Task Force officers present at the shooting.  These sworn statements were taken several days after the incident pursuant to FBI procedures.

In the sworn statements, officers Doe 1 and Doe 2 stated the following relevant facts.  Both officers were working as members of the Task Force.  They had been involved in prior surveillance of Rahim and were aware that he had acquired knives.[5] Both officers arrived at the CVS around 6:00 a.m. on June 2, 2015, to conduct a surveillance shift on Rahim.  When Doe 2 spoke to a Task Force supervisor around this time, the supervisor told him that Rahim intended to attack law enforcement that day and must be

---

[4]     Doe 2 initially filed a motion to dismiss.  The district court denied this motion without prejudice to Doe 2's ability to advance the same legal arguments in a motion for summary judgment, which Doe 2 subsequently filed.  The United States, substituted as a defendant for Doe 1 as to the state law claims, also moved for summary judgment as to these claims.

[5]     The Task Force had information that Rahim and his coconspirators planned to behead an American citizen in New York at the behest of an ISIL militant.  The Task Force learned that Rahim ordered three large knives over the internet and that these knives were delivered to his home.  The FBI intercepted and x-rayed one of the deliveries to confirm that it contained a knife.

prevented from boarding public transportation. Doe 2 requested backup but wanted to ensure that uniformed officers stayed back from the immediate area given Rahim's intentions to harm law enforcement.

As to the confrontation itself, officers Doe 1 and Doe 2 stated that, when approached, Rahim drew a large knife and wielded it in an aggressive manner while advancing on the officers. They asserted that Rahim was continuously non-compliant with commands to drop the knife, that his facial expression evinced an intent to do harm, that he was within the twenty-one-foot danger zone within which an assailant armed with a knife can strike before officers have time to react, and that they believed Rahim to pose an immediate deadly threat to themselves and others. In particular, Doe 2 feared that, as one of the other officers retreated toward the curb, she might trip backward and become particularly vulnerable to a knife attack. The three other Task Force members gave essentially the same account.

In addition to these sworn statements, the government offered a report prepared by the Suffolk County District Attorney (the "D.A. Report") concluding that the officers acted "reasonably and lawfully,"[6] a recording and transcript of Rahim's phone call

---

[6] We note that this is the unusual case where the facts have been previously examined in two government investigations (an FBI investigation and the D.A. Report), both of which considered

with Wright, a recording and transcript of Rahim's phone call to his brother, a photograph of a knife recovered from the scene, and security-camera video of the incident. The video shows Rahim advancing on the officers but is too blurry to identify what was in Rahim's hands.

In opposition to the government's motions for summary judgment, the Estate did not rely solely on its amended complaint. Rather, it submitted its own set of documents for consideration.[7] Chief among these were transcripts of five witness interviews conducted by law enforcement in the days following the incident. Four of these witnesses were civilians; one was an off-duty police officer. The government states that it is not aware of any additional witnesses.

The witness interview transcripts submitted by the Estate in opposition to summary judgment stated the following. Witness A is a ten-year-old child who was sleeping, heard gunshots, and looked out the window and saw someone lying on the ground. Witness B is an office worker in the area who saw police approach Rahim and command him to put his hands up before drawing their weapons. Witness B saw Rahim advance on the officers and saw the

---

sworn testimony among other evidence. The D.A. Report was made available to the Estate before the Estate filed its complaint.

[7] These materials had either been voluntarily provided to the Estate or acquired through separate litigation under a state freedom of information act.

officers back away for around seventy feet until they were at the edge of the parking lot. Witness B does not have good eyesight and did not see if Rahim had something in his hands. Witness B saw the officers toss something to the side after Rahim went down and saw an officer standing over this object. Witness C is a worker at a nearby labor yard who was walking into a Dunkin' near the CVS. Witness C heard a shot and saw an officer backing away and looking fearful but did not see who the officer fired at before Witness C took cover. Witness C later saw Rahim on the ground and did not see anything in his hands. Witness D is a local office worker who saw Rahim advance on the officers across the parking lot but could not see Rahim's hands. Witness D saw the officers throw something to the side after Rahim went down and stand over this object. Witness E is an off-duty police officer who was sitting in traffic on Washington Street. Witness E saw a group of individuals in the CVS parking lot but could not see specific movements or Rahim's hands.

In addition to transcripts of these witness interviews, the Estate also offered a transcript of the call to police dispatch (described supra) and various documents relating to the recovered knife and knife sheath, one of which stated that latent prints were not found on the sheath.

Finally, the Estate submitted an affidavit pursuant to Federal Rule of Civil Procedure 56(d) asserting that summary

- 14 -

judgment was premature because it had not yet had an opportunity to depose the officers, witnesses, and Task Force supervisors and because it did not have access to FBI use-of-force policies, unredacted versions of the witness transcripts and dispatch call, or forensic analysis of the knife recovered at the scene.

The district court heard argument on the summary judgment motions on May 4, 2020. The court concluded that the Estate had likely not demonstrated a genuine issue of material fact because, inter alia, the witness statements relied on by the Estate did not contradict the officers' sworn statements. The court also expressed skepticism that the Estate had made a case for discovery under Rule 56(d). But the court sua sponte granted the Estate a "second go-round" on the Rule 56(d) affidavit, ordering the Estate to be "very, very clear" as to the specific pieces of evidence that could overcome the qualified immunity defense.

On May 22, 2020, the Estate submitted its supplemental Rule 56(d) affidavit. The only new assertion offered in this affidavit was that the Estate should have the opportunity to depose the civilian witnesses to confirm "whether those witnesses observed Mr. Rahim to have a knife."

The government responded that this supplemental affidavit fell well short of the standard for granting relief under Rule 56(d). The government pointed out that, because the civilian

witnesses' statements did not contradict the officers' sworn statements, the Estate's request for discovery relied on speculation that the civilian witnesses would disavow their prior statements.

On December 2, 2020, the district court denied the summary judgment motions without prejudice to renewal after limited discovery. Est. of Rahim v. United States, 506 F. Supp. 3d 104, 122 (D. Mass. 2020). The court began by excluding the sworn statements of Doe 1, Doe 2, and the other three Task Force officers from consideration, reasoning that these statements were inadmissible at summary judgment because the officers had not been deposed. Id. at 113-14. The court also excluded the D.A. Report. Id. at 112-13. Even so, the court found that the officers would be entitled to summary judgment "[i]f [it] were to consider only the moment of the shooting." Id. at 118.

But the court denied summary judgment and authorized discovery on the theory that the proper focus was not just on the encounter itself but on the information possessed by the officers and their "plans, actions, observations, and means available to respond" in the lead-up to the encounter. Id. The court also found that it could not "fairly rule" on the qualified immunity

defense because the facts were "insufficient to determine exactly what the particular conduct was."  Id. at 120.[8]

Doe 1 and Doe 2 filed interlocutory appeals from the district court's denial of qualified immunity.

**II.**

We review a district court's denial of summary judgment on qualified immunity grounds de novo, Conlogue v. Hamilton, 906 F.3d 150, 154 (1st Cir. 2018), viewing the facts in the light most favorable to the nonmoving party, id. at 152.[9]

"The doctrine of qualified immunity shields officers from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  City of Tahlequah v. Bond, 142 S. Ct. 9, 11 (2021) (per curiam) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)).  It protects "all but the plainly incompetent or those who knowingly violate the law."  Id. (quoting District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018)).  Under

---

[8]    The district court also found that the defendants were not entitled to summary judgment on the Estate's state law claims. See id. at 120-22.  That aspect of the ruling is not at issue.

[9]    No party contests the existence of appellate jurisdiction, and correctly so.  There is no dispute of material fact as to whether the officers are entitled to immunity, as explained above.  See Valdizán v. Rivera-Hernandez, 445 F.3d 63, 65 (1st Cir. 2006) ("[W]e remain free to examine, on an interlocutory appeal, whether [a] fact makes any cognizable legal difference.").

the familiar two-prong framework, courts ask (1) whether the defendant violated the plaintiff's constitutional rights and (2) whether the right at issue was "clearly established" at the time of the alleged violation. Conlogue, 906 F.3d at 155. The prongs need not be addressed in order, and an officer may be entitled to immunity based on either prong. Id.

The "clearly established" prong itself comprises two inquiries. Id. The plaintiff must "identify either controlling authority or a consensus of persuasive authority sufficient to put an officer on notice that his conduct fell short of the constitutional norm." Id. The plaintiff must also "show that an objectively reasonable officer would have known that his conduct violated the law." Id. This latter requirement provides "breathing room" to officers -- who are often called on to respond to dangerous, rapidly evolving situations -- by affording them immunity even when they make reasonable mistakes about the lawfulness of their conduct. Id. The plaintiff's burden to demonstrate that the law was clearly established is thus "a heavy burden indeed." Lachance v. Town of Charlton, 990 F.3d 14, 20 (1st Cir. 2021) (quoting Mitchell v. Miller, 790 F.3d 73, 77 (1st Cir. 2015)).

We hold that the officers are entitled to qualified immunity under each aspect of the "clearly established" prong of the defense. First, we hold that the officers are entitled to

qualified immunity because the Estate has not identified any authority that would put the officers on notice that their actions were unlawful. Second, we hold independently that the officers are entitled to qualified immunity because an objectively reasonable officer facing the same fraught situation as Doe 1 and Doe 2 would not have known that the challenged conduct violated the law. And the officers are entitled to qualified immunity whether the focus is on the thirty-second fatal encounter or the fatal encounter plus the officers' actions in the hour beforehand.

**A.**

The district court found that consideration of the "clearly established" prong of the qualified immunity defense was premature before discovery. See Est. of Rahim, 506 F. Supp. 3d at 120. We deem this inconsistent with the Supreme Court's command to "resolv[e] immunity questions at the earliest possible stage in litigation." Pearson, 555 U.S. at 232 (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991) (per curiam)). Indeed, "the 'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that '"insubstantial claims" against government officials [will] be resolved prior to discovery.'" Id. at 231 (alteration in original) (quoting Anderson v. Creighton, 483 U.S. 635, 640 n.2 (1987)). Even where certain facts are disputed, courts must assess whether a plaintiff's allegations -- or here, the Estate's allegations as modified by the current undisputed

evidence in the summary judgment record -- make out a claim sufficient to overcome qualified immunity before denying a motion for summary judgment and authorizing discovery. See Anderson, 483 U.S. at 646 n.6.

The district court correctly found, contrary to the argument presented by the dissent,[10] that if it "were to consider only the moment of the shooting, [the officers] would be correct that they have met their burden for [the Estate] to respond and

---

[10] The dissent cites Estate of Todashev v. United States, 815 F. App'x 446 (11th Cir. 2020) (per curiam), an unpublished, out-of-circuit case not relied on by the Estate where the court remanded for additional discovery prior to summary judgment. See id. at 455. The officers could not have had notice of Todashev, as that case was decided five years after the events at issue. Todashev, on its facts, is also plainly distinguishable and would not support discovery here. In Todashev, the existing record evidence was inconsistent and the fact that Todashev was shot multiple times in the back suggested that he may have been fleeing rather than advancing on the officers. See id. at 448. The Todashev plaintiff sought discovery not on a speculative, unsupported theory of the encounter but on a request for reports and expert testimony to buttress the conclusion that Todashev was attempting to flee from the officers. See id. at 451-55. Here, in contrast, the Estate's theory that Rahim may have been unarmed lacks a basis in the record.

Harbert International, Inc. v. James, 157 F.3d 1271 (11th Cir. 1998), cited by the Todashev court, is instructive. There, the Eleventh Circuit found that a district court did not abuse its discretion in denying additional discovery in a qualified immunity case where, based on the evidence before the court including affidavits from the defendants, it was unlikely that further discovery would establish that the defendants violated clearly established law. Id. at 1280-81. Harbert supports our conclusion here that additional discovery would not change the outcome of the summary judgment analysis.

- 20 -

that no new evidence would likely change the outcome."  Est. of Rahim, 506 F. Supp. 3d at 118.[11]

[11]  This finding by the district court is consistent with the requirements of Rule 56(d), and that should have ended the matter.  "Rule 56(d) does not condone a fishing expedition where a plaintiff merely hopes to uncover some possible evidence of unlawful conduct."  Johnson v. Moody, 903 F.3d 766, 772 (8th Cir. 2018) (quoting Toben v. Bridgestone Retail Operations, LLC, 751 F.3d 888, 895 (8th Cir. 2014)); see also Vargas-Ruiz v. Golden Arch Dev., Inc., 368 F.3d 1, 4 (1st Cir. 2004) ("[A plaintiff] must offer the trial court more than optimistic surmise.").  To obtain additional discovery, a party must show, inter alia, "a plausible basis for believing that the specified facts probably exist."  Pina v. Childs.' Place, 740 F.3d 785, 794 (1st Cir. 2014); see also Rivera-Torres v. Rey-Hernández, 502 F.3d 7, 12 (1st Cir. 2007) (finding that this requirement was not satisfied); Doe v. Brown Univ., 943 F.3d 61, 71 (1st Cir. 2019) (similar).  And in qualified immunity cases, the Rule 56(d) analysis is conducted "with a thumb on the side of the scale weighing against discovery." Harbert, 157 F.3d at 1280; see also Garner v. City of Ozark, 587 F. App'x 515, 518 (11th Cir. 2014) (per curiam) (applying this principle and finding that further discovery was not warranted); Olaniyi v. District of Columbia, 763 F. Supp. 2d 70, 101 n.26 (D.D.C. 2011) (same).

The officers' five sworn statements are detailed, consistent, and uniformly state that Rahim had a large knife in his hand as he advanced on the officers.  The officers described this knife as "15 to 18 inches," a "large . . . military knife," "a dagger looking knife, with a large, straight blade," "approximately 2 feet long," and "a large black knife similar to a Bowie knife."  And undisputed record evidence establishes that Rahim advanced on the officers and they retreated, that he refused to drop what he was holding despite repeated commands, that he taunted the officers to drop their weapons instead, and that the officers immediately secured the object Rahim had in his hands once he went down.  On this record, it is not plausible that any of the officers will probably testify in a deposition that Rahim was unarmed.

And in any event, the focus required by law must be on what an objective officer would have perceived leading up to and in the split-second decision to shoot.

- 21 -

We also note that the sworn statements submitted by the officers in support of their motions for summary judgment should have been admitted. The Estate never argued that the statements were inadmissible. To the contrary, the Estate accepted as undisputed many facts based on these statements and even cited the statements in support of its opposition to summary judgment. The motions hearing colloquy reflects an understanding -- shared by both parties and by the court -- that the statements were admissible. And while the Estate sought to depose the officers, this was a request for discovery, not a challenge to the admissibility of the statements already in the record.

Nor do the Federal Rules of Civil Procedure condition the admissibility of sworn statements at summary judgment on a prior deposition. To be admissible at summary judgment, an affidavit or declaration "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4) (emphasis added); see also id. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." (emphasis added)). "[T]he standard is not whether the evidence at the summary judgment stage would be admissible at trial -- it is whether it could be presented at trial

- 22 -

in an admissible form." Gannon Int'l, Ltd. v. Blocker, 684 F.3d 785, 793 (8th Cir. 2012).

However, the government does not rely on these statements in its appeal, and so we do not consider them. Our holding does not rest on the exclusion of the statements but rather on the merits of the district court's denial of qualified immunity.

The officers are entitled to qualified immunity on the current record for the reasons we now discuss.

**B.**

We hold first that the Estate has failed to meet its burden to identify controlling authority or a consensus of persuasive authority sufficient to put the officers on notice that their conduct violated the law. See Conlogue, 906 F.3d at 155; see also Rivera-Corraliza v. Morales, 794 F.3d 208, 214-15 (1st Cir. 2015) (noting that plaintiffs' failure to identify such authority is fatal to their claims); MacDonald v. Town of Eastham, 745 F.3d 8, 14-15 (1st Cir. 2014) (finding officers entitled to qualified immunity based on this element of the defense). While a case "directly on point" is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting White v. Pauly, 137 S. Ct. 548, 551 (2017) (per curiam)). And "specificity is 'especially important in the Fourth Amendment context,' where it is 'sometimes difficult for an officer

to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" Bond, 142 S. Ct. at 11-12 (quoting Mullenix v. Luna, 577 U.S. 7, 12 (2015) (per curiam)).

The Estate has not come close to meeting its burden of identifying controlling authority or a consensus of persuasive authority. The Estate did not advance any argument on this point, much less identify sufficiently analogous precedents. It did not do so despite the fact that the government pointed out this absence of argument both in the district court and in its opening briefs.

The fact that the Estate cited -- in the district court, not in its appellate briefing -- to a single, twenty-one-year-old, out-of-circuit case does not satisfy its burden for a number of reasons beyond the obvious reason of waiver by the Estate. That case, Deorle v. Rutherford, 272 F.3d 1272 (9th Cir. 2001), is insufficient as a matter of law to meet the Estate's burden: it is neither controlling authority nor a "consensus" of persuasive authority. Conlogue, 906 F.3d at 155. Deorle is also inapposite because it has been superseded by the many later Supreme Court and circuit precedents we discuss below.

In any event, Deorle is plainly distinguishable. It involved an unarmed, mentally disturbed man on his own property who had "complied with the police officers' instructions," had not received warnings prior to the use of force, and "had discarded

- 24 -

his potential weapons whenever asked to do so." Deorle, 272 F.3d at 1285; see also id. at 1278. And the Supreme Court has twice rejected the broad reading of Deorle favored by the dissent. See Kisela, 138 S. Ct. at 1154 ("This Court has already instructed the Court of Appeals not to read its decision in [Deorle] too broadly in deciding whether a new set of facts is governed by clearly established law."); City & Cnty. of S.F. v. Sheehan, 575 U.S. 600, 614 (2015) (finding that the differences from Deorle "leap[t] from the page" because, inter alia, Sheehan was "dangerous" and "recalcitrant" while Deorle was not).

### C.

We hold independently that the officers are entitled to qualified immunity because objectively reasonable officers in their position would not have understood their actions to violate the law. See Conlogue, 906 F.3d at 155; see also, e.g., Justiniano v. Walker, 986 F.3d 11, 28-29 (1st Cir. 2021) (finding officer entitled to qualified immunity on this basis); Mlodzinski v. Lewis, 648 F.3d 24, 37 (1st Cir. 2011) (same); Wilson v. City of Boston, 421 F.3d 45, 57-59 (1st Cir. 2005) (same). We hold further that a reasonable officer in this situation would have understood Rahim to have a lethal knife in his hands. We also hold that a reasonable officer, on the undisputed facts, would have understood Rahim's actions to show that he had every intention to use this knife to

kill the officers and, if they were unsuccessful in stopping him, to kill other people.

In the case law concerning the reasonableness of officers' use of force, the following factors among others have been thought to be relevant. Each is present here.

- Whether a reasonable officer on the scene could believe that the suspect "pose[d] an immediate threat to police officers or civilians." <u>Fagre</u> v. <u>Parks</u>, 985 F.3d 16, 23-24 (1st Cir. 2021) (quoting <u>Conlogue</u>, 906 F.3d at 156); <u>see also</u> <u>Kisela</u>, 138 S. Ct. at 1152. Here, an objectively reasonable officer would have such a belief based on both his or her knowledge going into the encounter that Rahim was armed and planned to carry out an imminent attack[12] and

___

[12] The Estate conceded this point. At the motions hearing, counsel for the Estate argued:

> At what point did [the officers] believe there was an imminent threat? Was it at the point they approached him? Was it at the point all morning long? Was that already a preconceived notion in the officers' heads when they stopped him and immediately drew their weapons? I understand certainly them being able to draw their weapons and the discretion they have in how they would have conducted the stop. But immediately going to pull the weapons <u>and him having a knife and the officers being aware, frankly, that he had a knife, was it reasonable for the officers to perceive this as an imminent threat</u> when for a period of two hours nothing was done during that time and essentially approaching him at

- 26 -

on Rahim's aggressive and escalatory actions during the encounter itself.

- Whether a warning was given before the use of force and whether the suspect complied with this command. See, e.g., Kisela, 138 S. Ct. at 1153-54; Escalera-Salgado v. United States, 911 F.3d 38, 41 (1st Cir. 2018); Conlogue, 906 F.3d at 156-57; McKenney v. Mangino, 873 F.3d 75, 82 (1st Cir. 2017). Here, the officers gave at least nine total commands for Rahim to put his hands up and/or to drop what he was holding. Rahim did not comply.

- Whether the suspect was armed -- with a gun, knife, or otherwise -- at the time of the encounter or whether the officers believed the suspect to be armed. See, e.g., Kisela, 138 S. Ct. at 1154; Sheehan, 575 U.S. at 612;

---

that time and saying, [w]ell, there was a knife, and immediately that there's an imminent threat?

(Emphasis added.) The Estate advanced a similar theory in its district court briefing. As such, the Estate is now estopped from taking a contrary position. See Beddall v. State St. Bank & Tr. Co., 137 F.3d 12, 23 (1st Cir. 1998) ("We generally will not permit litigants to assert contradictory positions at different stages of a lawsuit in order to advance their interests.").

The Estate also conceded this point by failing to meaningfully respond to the government's argument that the statements in the Estate's complaint represent admissions that the officers reasonably believed Rahim to be armed. See Thompson v. Barr, 959 F.3d 476, 490 n.11 (1st Cir. 2020) (finding that an appellee's failure to address conspicuous, nonfrivolous arguments in an appellant's opening brief can constitute waiver).

- 27 -

Fagre, 985 F.3d at 24; Escalera-Salgado, 911 F.3d at 41; Conlogue, 906 F.3d at 156.  Here, the officers believed that Rahim was armed with a knife in his hands at the time of the encounter.  They repeatedly commanded him to drop what he was holding.  Rather than contest that he was holding a weapon, Rahim responded by taunting the officers to drop their weapons instead.

- The speed with which officers had to respond to unfolding events, both in terms of the overall confrontation and the decision to employ force.  See, e.g., Kisela, 138 S. Ct. at 1153-54; Sheehan, 575 U.S. at 612; Graham v. Connor, 490 U.S. 386, 396-97 (1989); Conlogue, 906 F.3d at 158; McKenney, 873 F.3d at 79-80.  Here, the entire encounter unfolded over about thirty seconds and the officers' decision to shoot had to be made within seconds when, despite their commands to drop what was in his hands, Rahim kept advancing with what they had every reason to believe was a weapon.

- Whether the suspect was advancing on the officers or otherwise escalating the situation.  See, e.g., Sheehan, 575 U.S. at 612-13; Conlogue, 906 F.3d at 156.  Rahim was doing both.  He advanced on the officers while taunting them (at least eight times) to drop their weapons.

- The suspect's physical proximity to the officers at the time of the use of force. See, e.g., Kisela, 138 S. Ct. at 1154; Sheehan, 575 U.S. at 613; McKenney, 873 F.3d at 82. Rahim was within range to seriously injure the officers at the time they fired.

- Whether multiple officers simultaneously reached the conclusion that a use of force was required. See Conlogue, 906 F.3d at 156. Doe 1 and Doe 2 did so here.

- The nature of the underlying crime. See Rivas-Villegas v. Cortesluna, 142 S. Ct. 4, 8 (2021) (per curiam) (citing Graham, 490 U.S. at 396). Here, Rahim had stated his intention to kill someone that day or the next, and the officers had every reason to believe that a lethal terrorist attack was imminent.

Each one of these considerations supports the grant of qualified immunity here on the undisputed facts. An objectively reasonable officer would have understood that Rahim posed a lethal threat to them. They would also have understood that Rahim had to be apprehended and stopped before he could commit a "random" act of violence at the bus stop, on the bus, or later in the day.

The Supreme Court has repeatedly found that officers acting under such circumstances do not violate clearly established law. Two of the Court's recent grants of qualified immunity are illustrative. In City of Tahlequah v. Bond, officers shot and

killed a suspect who refused repeated commands to drop a hammer and whose movements suggested that he was preparing to throw the hammer or charge at the officers. 142 S. Ct. at 10-11. The Court found that under such circumstances the officers "plainly did not violate any clearly established law" and thus were entitled to qualified immunity. Id. at 11; see also id. at 12. And in Kisela v. Hughes, officers shot a knife-armed woman who had been seen acting erratically, had approached a civilian, and who refused repeated commands to drop the knife over the course of an encounter lasting less than a minute. 138 S. Ct. at 1151. The Court found that this was "far from an obvious case in which any competent officer would have known that shooting [the suspect] to protect [the civilian] would violate the Fourth Amendment." Id. at 1153; see also, e.g., Sheehan, 575 U.S. at 612-13 (finding that officers' use of force against a knife-armed individual who "kept coming" at them was reasonable).

Precedents from our circuit and others similarly recognize that officers are entitled to qualified immunity under such circumstances. In Escalera-Salgado v. United States, for example, officers executed a search warrant at the residence of a known drug trafficker and gang leader in Puerto Rico. 911 F.3d at

39.[13]  They believed the suspect had guns in the house.  Id.  As the suspect emerged from the bedroom, an officer yelled "police" and commanded him to show his hands and stay still.  Id.  The suspect ignored these commands and reached for his waistband, at which point two officers fired.  Id.  We held that these officers were entitled to qualified immunity on the "clearly established" prong of the defense because the suspect "failed to compare his shooting to the facts of a single case in which an officer's use of force was held to be constitutionally excessive" and the officers' conduct was not "self-evidently unlawful."  Id. at 41.  We found that, despite not actually seeing a weapon, the officers had "ample reason to suspect danger" based on, inter alia, their belief that the suspect was armed, the suspect's failure to comply with police commands, and the suspect's behavior suggesting that he was reaching for a weapon.  Id. at 41-42.

In Conlogue v. Hamilton, we considered a claim arising out of an officer's use of deadly force at the climax of a three-

---

[13]   We note that Escalera-Salgado arose in the context of the Federal Tort Claims Act (FTCA) in Puerto Rico rather than as a Bivens claim.  911 F.3d at 40.  The court in that case, however, clarified the connection between the FTCA in Puerto Rico and Bivens claims, stating: "The district court's qualified immunity analysis relied upon our circuit's oft-repeated assumption 'that Puerto Rico tort law would not impose personal liability' in tort actions 'where the officers would be protected in Bivens claims by qualified immunity.'"  Id. (quoting Solis-Alarcón v. United States, 662 F.3d 577, 583 (1st Cir. 2011)).  Therefore, its reasoning is applicable here.

and-a-half-hour standoff with an armed, suicidal individual in LaGrange, Maine. 906 F.3d at 152, 155. Officers responded to a call for help from the suspect's wife, who reported that the suspect was skilled with guns and was threatening to take his own life. Id. at 156. When the officers arrived, they found the suspect sitting outside his car in front of a restaurant and across the street from a private residence. Id. at 152-53. He had a gun to his head. Id. at 153. The suspect remained in this position for an hour and twenty minutes. Id.

The suspect then began pacing around with the gun in his hand. Id. He seemed to be assessing the scene and gathering strength, and shouted obscenities at the officers in response to their attempts to communicate with him. Id. At this point, the suspect ceased to be a threat only to himself and began to pose a threat to the officers on the scene. See id. at 156, 158 n.4. The officers repeatedly asked him to put down his gun. Id. at 153. He refused to comply, retrieved a knife from his car, and moved toward the officers. Id. He then began to alternate pointing the gun at his own head and toward the officers. Id. The officers "forcefully" commanded the suspect to "put the gun down right now!" Id. at 153-54. He refused. Id. at 154. At that point, the suspect was within easy firing range of the officers. Id. at 155. After the suspect continued to refuse to drop his weapon, an officer fired. Id. at 154. In affirming the

district court's grant of summary judgment based on qualified immunity, we held that an objectively reasonable officer in the defendant officer's position would not have thought it was a violation of the law to use deadly force under these circumstances. Id. at 156-57. We reasoned that the defendant officer was "keenly aware" of the threat posed by the suspect and was also aware of the suspect's continued escalation of the situation and his refusal to comply with repeated commands to drop his weapon. Id. at 156, 159.

And in Sigman v. Town of Chapel Hill, 161 F.3d 782 (4th Cir. 1998), officers responded to a report of a domestic dispute involving an individual armed with a knife. Id. at 784. The suspect emerged from the house, refused repeated commands to drop what he was holding, and advanced on the officers while telling them to "[g]o ahead and shoot me." Id. at 785. When the suspect was within ten to fifteen feet of the officers, one of them fired. Id. A large knife was recovered from the scene. Id. at 788. On these facts, the Fourth Circuit found that the officer was entitled to qualified immunity:

> Where an officer is faced with a split-second decision in the context of a volatile atmosphere about how to restrain a suspect who is dangerous, who has been recently -- and potentially still is -- armed, and who is coming towards the officer despite officers' commands to halt, we conclude that the officer's decision to fire is not unreasonable. Accordingly, we reject the

- 33 -

> argument that a factual dispute about whether Sigman still had his knife at the moment of shooting is material to the question of whether Officer Riddle is entitled to the protections of qualified immunity in the particular circumstances of this case.

Id.

Similarly, in the case before us the officers reasonably believed that Rahim was a terrorist suspect, that he was armed with a military-style knife and -- from an objective perspective based on intelligence -- intended to kill, and that he posed an imminent threat both to law enforcement and to members of the public. After the Task Force intercepted Rahim's 5:18 a.m. call on the morning of June 2, 2015, the officers were operating under substantial time pressure to stop Rahim before he could board public transportation. When they approached him in the CVS parking lot shortly after 7:00 a.m., Rahim refused repeated commands to put his hands up. Instead, he advanced on the officers with something in his hands. The officers retreated across the length of the parking lot while repeatedly commanding Rahim to "drop it!" Rahim refused and taunted them to drop their weapons. The officers did not fire until Rahim had refused at least nine total commands, was within twenty-five feet of the officers, and had backed them up against the edge of the parking lot. At this point, two officers made the split-second decision to fire. The entire encounter lasted around thirty seconds.

Under these circumstances, an objectively reasonable officer would not have understood the challenged conduct to violate the law. See Conlogue, 906 F.3d at 155. An objectively reasonable officer would have understood Rahim to be dangerous, armed with a military-style knife, and preparing to conduct a terrorist attack, an extremely serious crime. The encounter was precisely the sort of "tense, uncertain and rapidly evolving" situation where officers are forced to make split-second decisions for their safety and the safety of others. Graham, 490 U.S. at 397. The officers gave clear and repeated warnings before employing deadly force, warnings which Rahim ignored. They did not fire until Rahim had advanced and was close enough to them to use a knife. And the fact that two officers simultaneously made the split-second decision to fire supports the objective reasonableness of their decision.

The officers had a more-than-reasonable basis for believing Rahim was armed with a military-style knife both before and during the encounter. The officers also had a more-than-reasonable basis to believe that Rahim had left his apartment that morning with an intent to kill a "boy[] in blue" and/or other people. There is no dispute Rahim said exactly those things.

**D.**

The officers are entitled to qualified immunity even if we consider their actions between learning of Rahim's phone call

- 35 -

to Wright at some point after 6:00 a.m. and approaching him in the CVS parking lot shortly after 7:00 a.m. The Estate suggests that, after learning that Rahim was an imminent threat, the officers should have apprehended him sooner and/or acquired a warrant. But the officers were operating under significant time pressure during this period, with at most an hour to develop a plan, call for backup, approach Rahim, and stop him from boarding public transportation. And the Estate's only theory, that this pre-confrontation conduct may render the officers' later actions unreasonable by bearing on their "intent" in approaching Rahim, is not viable because the excessive-force inquiry is undertaken "without regard to [officers'] underlying intent or motivation." Graham, 490 U.S. at 397. The Estate has not otherwise asserted a claim based on the officers' conduct during this earlier period.

And the Estate has pointed to no precedent, and we have found none, establishing that the officers' pre-confrontation conduct violates clearly established law.[14] Nor has the Estate

---

[14] We disagree with the district court's interpretation of our precedents on the relevance of officers' pre-seizure actions. We have not adopted the broad rule that officers have a duty to avoid creating situations which increase the risk that deadly force may be used. See Napier v. Town of Windham, 187 F.3d 177, 188 (1st Cir. 1999); St. Hilaire v. City of Laconia, 71 F.3d 20, 27 (1st Cir. 1995). And while we have recognized that pre-seizure conduct may be relevant in the reasonableness analysis, we have done so in cases where there is a much closer connection between such conduct and the ultimate seizure. Cf. Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 22 n.13 (1st Cir. 2005)

shown that an objectively reasonable officer in Doe 1 or Doe 2's position would understand such conduct to violate the law. The officers are entitled to qualified immunity as a matter of law.

## III.

Reversed and remanded with instructions to enter summary judgment for officers Doe 1 and Doe 2.

**-Dissenting Opinion Follows-**

---

(distinguishing Napier as "not hold[ing] that events immediately leading up to a shooting cannot be considered as part of the totality of the circumstances along with the precise instant surrounding a shooting" (emphasis added)).

**BARRON**, **Chief Judge**, **dissenting**. The officers who fatally shot Usaamah Abdullah Rahim seek summary judgment based on qualified immunity. They do so, however, even before the plaintiff, Rahim's Estate, has had a chance to question them about what they knew at the time that they fired on Rahim. Thus, there is good reason to be concerned that the officers' request is premature.

To be sure, the Estate appears to accept that the record is sufficiently developed to establish conclusively that the officers had been reliably informed by the time that they confronted Rahim that a suspect matching his description was on the loose who had threatened to behead someone and was "armed with a knife." The Estate also appears to accept that the record is sufficiently developed to establish conclusively that the officers, upon confronting Rahim, commanded that he drop whatever he may have had in his hands and that he refused to comply.

But, to me, the key question is whether the record also is sufficiently developed to establish conclusively that the officers had information at the time that they fired on Rahim that reasonably led them to think that he was advancing toward them while holding in hand what they thought was a deadly weapon or that in so advancing he was at least reaching for one. For, if the record in even its present undeveloped state is also conclusive in that respect, then the officers are entitled to summary judgment

based on qualified immunity, even accepting the District Court's determination that the Estate's questioning of the officers might produce testimony that would give rise to a factual dispute about whether they could have taken steps to defuse the situation. See Est. of Rahim v. United States, 506 F. Supp. 3d 104, 118-19 (D. Mass. 2020).

I reach that conclusion because, in that event, the summary judgment record conclusively would show that the officers were faced with a split-second decision about how best to address the immediate threat that Rahim posed when they fired on him. And, it would then follow, the Estate would not be able to show that the officers' use of force to subdue Rahim violated clearly established law, notwithstanding that the Estate might be able to show through questioning of the officers that they could have done things to prevent that climactic moment from occurring. See Pearson v. Callahan, 555 U.S. 223, 231 (2009); Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018); see also, e.g., Sigman v. Town of Chapel Hill, 161 F.3d 782, 787-88 (4th Cir. 1998).

The Estate contends, however, that the record is not clear in conclusively establishing that the officers reasonably thought that Rahim was holding in hand or reaching for a deadly weapon when they fired on him. And, I agree with the Estate on that score. Thus, I conclude that the summary judgment record -- at least in its present state -- permits a reasonable juror to

find that the officers' use of deadly force against Rahim was excessive under clearly established law. See Williams v. City of Burlington, 27 F.4th 1346, 1352-53 (8th Cir. 2022) (noting unanimously in denying qualified immunity at the summary judgment stage that, despite a response to a request for admissions in which "the estate responded that [the officer] had a reasonable belief that [the decedent] had a gun when [the officer] used deadly force," it would be improper to "construe the response against the estate" when discovery had uncovered other "evidence about whether [the decedent] had a gun" (citing Tolan v. Cotton, 572 U.S. 650, 655 (2014) (per curiam))); cf. Est. of Todashev v. United States, 815 F. App'x 446, 453-54 (11th Cir. 2020) (per curiam) (holding that the district court abused its discretion in denying a Rule 56(d) request to conduct discovery that the plaintiff -- the estate of a suspected terrorist shot by an FBI officer following questioning at his residence -- argued would create a "dispute of material fact as to whether [the officer]'s use of deadly force was objectively reasonable" prior to ruling on the officer's summary judgment motion).

## I.

To conclude otherwise, the majority first relies on the Estate's alleged failure to "meet[] its burden" to identify "sufficiently analogous precedents" to show that the use of deadly force against Rahim violated clearly established law. But, a

plaintiff seeking to overcome a defense of qualified immunity need not identify an identical case to fend off that defense, Hope v. Pelzer, 536 U.S. 730, 740-41 (2002), and, when prompted below, the Estate offered authority to show that the use of deadly force by the officers would have been excessive if in using such force they did not understand Rahim to have had a deadly weapon in hand or to have been reaching for one, see Deorle v. Rutherford, 272 F.3d 1272, 1282-85 (9th Cir. 2001) (reviewing case law and explaining that shooting at a person "walk[ing] in the direction of an officer at a steady gait with a can or bottle in his hand is clearly not objectively reasonable").

The majority does not identify a single case that indicates otherwise. Indeed, the case that it identifies that appears the most analogous, Sigman v. Town of Chapel Hill, 161 F.3d at 788, if anything, favors the Estate. There, a Fourth Circuit panel granted summary judgment based on qualified immunity over a dissenting opinion to an officer who fatally shot a domestic violence suspect. The suspect in that case, after a "highly volatile" encounter in which he had swung a "chef's knife" and "thr[own] objects at [the officer] through [a] broken window," stepped outside of the house covered in blood, ignored commands to stand down, and began advancing on the officer. Id. at 784-85, 787. But, while it is true that the estate there had argued that the officer was not entitled to immunity on the ground that it was

not clear that the suspect had been holding a knife when he was shot, the majority concluded otherwise only because it determined based on the officer's deposition testimony -- and that of five other officers on the scene -- about what they had observed that it was indisputable that the officer had "acted on the perception that Sigman had a knife in his hand."  Id. at 788 (emphasis added).[15]

The majority may mean to be arguing that the Estate did not identify precedent to show that the officers' conduct would have violated clearly established law insofar as the officers did reasonably believe that Rahim was holding a knife in his hand at the key moment.  But, that contention depends on an underlying contention about what the present state of the undeveloped record conclusively shows, which turns out to be the basis for the majority's second rationale for ruling as it does.  I thus now turn to that rationale.

---

[15] The dissent in Sigman took issue with the majority's conclusion that the plaintiff had failed to create a genuine dispute as to whether the officer reasonably thought that the target was holding a knife at the moment the officer shot him, due to witness affidavits that contradicted the officer's deposition testimony.  161 F.3d at 791-92 (Michael, J., dissenting).  The dissent concluded that it was improper, in light of that evidence, for the majority to credit the officer's account, and that it was instead necessary for a factfinder to determine "what was actually happening during the event . . . to evaluate the reasonableness of [the officer]'s perceptions and actions."  Id. at 791.

In this second rationale, the majority asserts that "it is not plausible that any of the officers will probably testify in a deposition that Rahim was unarmed."[16] This assertion does not help the majority if by "unarmed" the majority is agreeing with the Estate that the record at present conclusively shows that Rahim had a weapon on his person, though not in his hand, and that he was not reaching for that weapon. As I have just explained, the use of deadly force against Rahim by officers who did not think that he was holding a deadly weapon or reaching for one when they fired on him would be excessive under clearly established law.

But, the majority may mean to be contending that it is not plausible that the officers "probably" would provide testimony

---

[16] After the officers filed their pre-discovery summary judgment motion in the District Court, counsel for the Estate invoked Rule 56(d), which by its terms permits a non-moving party to seek deferral or denial of a summary judgment motion upon "show[ing] by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). As this Court has explained, so long as there is good cause for the failure to discover the relevant facts sooner, "timely" and "authoritative" requests made under this rule should be "liberally grant[ed]" if there is a "plausible basis for believing that the specified facts probably exist," and such facts, if collected, would "influence the outcome of summary judgment." Pina v. Child.'s Place, 740 F.3d 785, 794 (1st Cir. 2014) (citing Simas v. First Citizens' Fed. Credit Union, 170 F.3d 37, 45-46, 45 n.4 (1st Cir. 1999)). The Estate in its Rule 56(d) request specifically sought depositions of the officers and other witnesses in order to, among other things, "uncover information contradicting the defendants' version of events," including their alleged "belief that Mr. Rahim was holding a knife" when they shot him.

that could give rise to a genuine issue of disputed fact about whether Rahim was holding a knife in his hand when the officers shot him, such that we must treat the present record as if it conclusively establishes that the officers did reasonably think that Rahim had such a weapon in hand at that key moment. Here, too, though, I am not persuaded.

There is literally nothing in the record on appeal that purports to state the officers' own views on that matter, and we must construe the record as it comes to us in the light most favorable to the Estate, because the Estate is the non-moving party. Tolan, 572 U.S. at 655-57; see also Crawford-El v. Britton, 523 U.S. 574, 600 n.22 (1998). In addition, qualified immunity does not protect those who are asserting it from discovery about the information that they in fact "possessed at the time of [their] allegedly unlawful conduct" if their possession of that information would bear on whether the immunity applies. Wood v. Clemons, 89 F.3d 922, 929-30 (1st Cir. 1996) (quoting McBride v. Taylor, 924 F.2d 386, 389 (1st Cir. 1991)); see Anderson v. Creighton, 483 U.S. 635, 646 n.6 (1987) ("[I]f the actions [the defendant] claims he took are different from those the [plaintiffs] allege (and are actions that a reasonable officer could have believed lawful), then discovery may be necessary before [the defendant]'s motion for summary judgment on qualified immunity grounds can be resolved."); see also Crawford-El, 523 U.S. at 593

n.14 (citing Anderson, 483 U.S. at 646 n.6, and explaining that neither Harlow v. Fitzgerald, 457 U.S. 800 (1982), "nor subsequent decisions [of the Supreme Court] create an immunity from all discovery" (emphasis in original)).

The majority does point to an account of what the officers say they saw in Rahim's hand that the officers themselves offered in affidavits. But, the District Court excluded that account from consideration of the motion for summary judgment precisely because the Estate had not been given a chance to test that account through adversarial questioning, Est. of Rahim, 506 F. Supp. 3d at 113-14, and the government, in appealing the District Court's denial of the motion, does not challenge that aspect of the District Court's summary judgment ruling.

That appellate waiver aside, it also is not evident that we have jurisdiction to consider the officers' untested account in resolving this interlocutory appeal. After all, we must decide this appeal by taking as given the facts on which the District Court relied. See McKenney v. Mangino, 873 F.3d 75, 84 (1st Cir. 2017) ("Although the defendant invites us to adopt a spin on the summary judgment record different from that taken by the district court, we lack jurisdiction to accept that invitation . . . .").

Finally, we cannot predict how the officers would be likely to testify if questioned by the party suing them by choosing to credit their as-yet-untested account. Our adversarial system

does not permit us to rely on such a say-so understanding of how truth is best discovered.

Accordingly, I can see no basis for concluding that it is probable that no evidence would emerge during discovery that would permit a reasonable juror to find that the officers thought that, as Rahim moved towards them, he neither had a deadly weapon in hand nor was reaching for one that was on his person. Indeed, the officers themselves -- once subjected to adversarial questioning -- could provide testimony that would provide support for just such a finding.

I should add that no precedent is to the contrary to my conclusion in this regard. The Eleventh Circuit has recognized that there are limits on permissible discovery in the face of an assertion of qualified immunity. See Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1280 (11th Cir. 1998). But, no case supports effectively preventing a plaintiff from questioning a defendant about facts critical to the determination of whether qualified immunity is warranted. See id. (explaining that the desired discovery "would [not] establish either that the defendants acted outside the scope of their discretionary authority or that they had violated clearly established law"); Garner v. City of Ozark, 587 F. App'x 515, 518 (11th Cir. 2014) (per curiam) (explaining that there was no showing that the desired expert opinions were relevant to the qualified immunity defense); see also Olaniyi v.

<u>District of Columbia</u>, 763 F. Supp. 2d 70, 101 n.26 (D.D.C. 2011) (relying on <u>Harbert</u> and explaining that the plaintiff had not identified potential facts that could "overcome the qualified immunity defense").[17]

In fact, the Eleventh Circuit has explained that it is "especially true in a deadly force case, where 'the witness most likely to contradict the officers' story -- the person shot dead -- is unable to testify,'" that the inquiry as to whether discovery under Rule 56(d) is warranted weighs in favor of relief, given that the relevant evidence and witnesses are "in the control of the moving party." <u>Est. of Todashev</u>, 815 F. App'x at 453-54 (first quoting <u>Ingle</u> v. <u>Yelton</u>, 439 F.3d 191, 195 (4th Cir. 2006), and then <u>McCray</u> v. <u>Md. Dep't of Transp.</u>, 741 F.3d 480, 484 (4th Cir. 2014)). And, like the defendant in <u>Estate of Todashev</u>, the defendants in this case do

> not claim that [they are] entitled to qualified immunity because [their] conduct would not have violated clearly established law under plaintiff's version of the facts. Rather, [they claim] that [they are] entitled to qualified immunity under [their own] version of the facts, based upon evidence that is almost exclusively within [their] control, while simultaneously prohibiting Plaintiff from conducting any discovery that might test or contradict [their] version.

---

[17] The same is true of the Eighth Circuit precedent that the majority cites on the issue. <u>See</u> <u>Johnson</u> v. <u>Moody</u>, 903 F.3d 766, 774 (8th Cir. 2018) ("Plaintiffs did not request additional discovery focused on the qualified immunity issue.").

Id. at 453 (emphasis and internal quotation omitted) (distinguishing Harbert, 157 F.3d at 1280).

The majority is right that Estate of Todashev is an unpublished opinion -- and from another circuit to boot. But, I see little reason to ignore its reasoning. It purports to apply the precedents of the Eleventh Circuit, and it is the precedents of that Circuit that the majority itself invokes in support of its position that no discovery as to what the officers believed was in Rahim's hand is warranted in this case. Moreover, that ruling also accords with the reasoning of other circuits, see Flythe v. District of Columbia, 791 F.3d 13, 19 (D.C. Cir. 2015) (collecting cases and noting that "courts . . . 'may not simply accept what may be a self-serving account by the police officer'" (quoting Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994))), as well as our own, cf. Asociación de Periodistas de P.R. v. Mueller, 680 F.3d 70, 77-78 (1st Cir. 2012) (holding that the district court did not abuse its discretion in partially granting a Rule 56(d) motion to the extent it "allow[ed] the plaintiffs to depose only those individuals who had supplied affidavits in support of the summary judgment motion").

**III.**

The majority's final rationale is that the Estate has "conceded" that the officers "[went] into the encounter" with a reasonable belief "that Rahim was armed and planned to carry out

an imminent attack."  If the majority means to suggest only that the Estate has conceded that the officers had been reliably informed that Rahim had threatened to kill someone and was armed with a knife (in the sense of having one on his person) that day, then I cannot disagree.  But, that concession would not on its own permit us to reverse the District Court and order that it grant summary judgment based on qualified immunity to the officers.  The record as it presently stands still would not conclusively establish in that circumstance that at the moment that the officers chose to use deadly force against Rahim they reasonably thought that he was holding or reaching for a deadly weapon.

Perhaps, then, the majority means that the Estate conceded -- either below or on appeal -- that the officers did have information that reasonably led to them to hold the belief that Rahim had a knife or other deadly weapon in his hand (or even that he was reaching for one) when they shot him.  But I can find no support in the record for our concluding that the Estate has made a concession of that kind.

True, the Estate's counsel did contend below that his client could survive summary judgment even if that was what the officers thought about what Rahim had in his hand at the key moment.  But, the Estate's counsel also repeatedly argued in the alternative that further discovery could produce facts that would call into question whether the officers "believ[ed] [that Rahim]

had a knife" and whether that alleged belief was "reasonable." Indeed, as the majority acknowledges, the Estate filed a Rule 56(d) affidavit seeking an opportunity to pursue such discovery. And, the Estate argues on appeal that it "disputes all of the[] facts" about the incident as presented by the officers, and that, "[b]ecause there has been no discovery . . . [the Estate] has not been able to interview or take depositions of any of the officers . . . [or] any of the civilian witnesses . . . some of whose accounts differ from those of the officers."[18]

## IV.

Qualified immunity prevents many claims of excessive force from succeeding precisely because of the in-the-moment nature of the judgment that officers attempting to subdue suspects must make. It does not permit courts to credit, though, the untested accounts that defendants accused of excessive force offer

---

[18] The majority also asserts that the Estate "conceded" that the "officers reasonably believed Rahim to be armed" on appeal "by failing to meaningfully respond to the government's argument that the statements in the Estate's complaint represent admissions that the officers reasonably believed Rahim to be armed." But, as the Estate has made clear to us, the complaint's allegations are caveated in each instance in a way that demonstrates that the Estate is not alleging itself that a particular event took place or that a particular impression was held. Cf. Williams, 27 F.4th at 1352. The majority's argument that the Estate is now estopped from taking the position that the officers did not believe Rahim had a knife in hand because such argument is "contrary" to its theory in the District Court is also mistaken. As I have explained, there is no inconsistency, given the alternative grounds for defeating summary judgment the Estate has pressed throughout.

when the plaintiff has been denied any chance to test those accounts.

The Estate pressed below and is pressing to us the argument that summary judgment must be denied to the officers because the Estate has not yet had a chance to test their account of just how much of a threat Rahim posed at the key moment. I am convinced that it is plausible that such testing would reveal a genuine factual dispute about whether the officers thought Rahim had a weapon in hand (or was reaching for one) during their deadly encounter with him. Accordingly, I respectfully dissent from the majority's decision to reverse the District Court's denial of the officers' motion for summary judgment.