# United States Court of Appeals
## For the First Circuit

No. 17-2210

DANARAE CONLOGUE, as personal representative
of the Estate of LEWIS N. CONLOGUE,

Plaintiff, Appellant,

v.

SCOTT HAMILTON,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Thompson, Selya, and Lipez,
Circuit Judges.

Hunter J. Tzovarras for appellant.
Jonathan R. Bolton, Assistant Attorney General, with whom
Janet T. Mills, Attorney General, and Cathy Roberts, Assistant
Attorney General, were on brief, for appellee.

October 11, 2018

**SELYA**, **Circuit Judge**.  This tragic case involves the fatal shooting of an armed civilian by a state trooper following a prolonged standoff.  The appeal turns on an application of the doctrine of qualified immunity — a doctrine that protects public officials (including police officers) from civil liability while acting under color of state law, save only for officials who act incompetently or in disregard of clearly established legal principles.  See Malley v. Briggs, 475 U.S. 335, 341 (1986).  The court below painstakingly catalogued the relevant facts, determined in a thoughtful rescript that the defendant was entitled to qualified immunity, and entered summary judgment accordingly. See Conlogue v. Hamilton, No. 1:16-cv-296, 2017 WL 5339895, at *2-8 (D. Me. Nov. 13, 2017).  After careful consideration, we affirm.

## I. BACKGROUND

When reviewing the entry of summary judgment, our task demands that we view the facts in the light most favorable to the non-movant (here, the plaintiff).  See Savard v. Rhode Island, 338 F.3d 23, 26 (1st Cir. 2003) (en banc).  Here, however, the raw facts are largely undisputed.  We set them forth below, urging the reader who hungers for more exegetic detail to consult the district court's rescript.

This case has its genesis in a set of facts that played out on August 3, 2014, in front of a deserted restaurant in the bucolic town of LaGrange, Maine.  At 3:41 p.m., DanaRae Conlogue

- 2 -

called 911 to report that her husband, Lewis N. Conlogue, was threatening suicide. She related that he had gotten out of their parked vehicle, put a gun to his head, and warned her to avert her eyes. Officers from the Penobscot County Sheriff's Office and the Maine State Police responded quickly to the scene. They took Mrs. Conlogue to a place of safety, established a command post, secured the perimeter, and assigned officers to strategically located positions.

Thomas Fiske, a Maine state trooper, arrived at around 4:17 p.m. and positioned himself with two other troopers on the lawn of a residence across the street from the restaurant (some 200 feet away). Defendant-appellee Scott Hamilton, a sergeant and a member of the state police's tactical team, arrived shortly thereafter. Hamilton had been specially trained in the use of deadly force in high-risk situations. From his vantage point, he could not see the other troopers but learned of their position from communications broadcast over a police-operated radio.[1] Hamilton also learned that Conlogue was brandishing a semi-automatic handgun — a fact that helped Hamilton to calibrate the level of threat posed.

---

[1] Throughout the remainder of the encounter, Fiske and the other officers were in constant radio communication. While Hamilton was not himself equipped with a radio, he was situated next to another trooper, Taylor Dube, who was so equipped. Thus, Hamilton heard all the relevant radio traffic.

For the first hour and twenty minutes, Conlogue remained mostly stationary, sitting on a rock with his gun pointed at his head. At approximately 5:02 p.m., Fiske reported that Conlogue had stood up and begun pacing around lethargically. In response to this report, Hamilton changed his position so that he could more clearly observe Conlogue through the magnifying scope attached to his rifle. Fiske then reported over the radio that Conlogue appeared to be assessing the scene: he was looking 360 degrees around his position and (according to Fiske) seemed to be gaining strength and momentum. At this juncture, another officer — William Sheehan of the Sheriff's Office — initiated direct communication with Conlogue.

Sergeant Sheehan, using a loudspeaker, repeatedly asked Conlogue to put down his weapon, assuring him that the officers were worried about him and were there to help. When Conlogue responded by yelling obscenities, the officers knew that Conlogue could hear Sheehan's words. Even so, Sergeant Sheehan's warnings seemed only to escalate the tension. Conlogue went to his car, retrieved a knife, placed it in his back pocket, moved back toward the troopers, shaped his fingers like a gun, and pointed the simulated gun at Fiske and the other troopers.

Next, Conlogue approached the road that separated him from the troopers. He paused to draw a line in the dirt, and Sheehan assured him that no officers would cross that line.

Conlogue then moved closer to the troopers and drew another line. Fiske became concerned for his own safety — a fear that he communicated to the other officers over the radio.

Despite continued warnings to put down his weapon and cooperate with the police, Conlogue refused to comply. He displayed a fully loaded magazine, placed the magazine into his gun, and pointed it at a forty-five degree angle over the heads of Fiske and the two other troopers. This action elicited a spate of warnings from Sheehan. Undeterred, Conlogue alternated between pointing the gun at his own head and pointing it in the direction of the troopers (at an angle of roughly forty-five degrees).

When Conlogue flexed his wrist and extended the gun in front of his body, Fiske immediately related over the radio that the gun was "[a]bout forty-five degrees . . . over our heads" and added that "I'm not comfortable." To Hamilton, Fiske's tone conveyed fear.[2] Sheehan spoke forcefully to Conlogue, demanding that "[y]ou need to put the gun down. You need to put the gun down right now!" Hamilton neither saw nor heard anything indicating that Conlogue was of a mind to comply. After waiting

_____

[2] Hamilton's assessment was on the mark. In a sworn declaration filed in support of Hamilton's motion for summary judgment, Fiske vividly described his situation: "Mr. Conlogue then began flexing his wrist, moving the barrel of the gun down closer to my head, and then back up. When he lowered the gun, I was able to see down the barrel."

eleven seconds, Hamilton fired a single shot that struck and killed Conlogue.

We fast-forward to May of 2016 when Mrs. Conlogue, in her capacity as personal representative of her husband's estate, brought suit in a Maine state court. Her complaint asserted claims for excessive force under 42 U.S.C. § 1983 and the Fourth Amendment, together with several causes of action under state law. Citing the existence of a federal question, Hamilton removed the suit to the federal district court. See 28 U.S.C. §§ 1331, 1441(a).

The parties engaged in pretrial discovery. Although the complaint originally named other defendants in addition to Hamilton, those defendants were dropped along the way. Following the completion of discovery, the parties (including Hamilton, as the sole remaining defendant) filed cross-motions for summary judgment. Hamilton's motion raised, inter alia, a qualified immunity defense. After marshaling the facts and carefully surveying the applicable case law, the district court found no precedent suggesting "that an officer's use of deadly force is objectively unreasonable when a person points a loaded gun at a forty-five degree angle over the heads of other officers after being warned repeatedly to drop the gun." Conlogue, 2017 WL 5339895, at *11. In addition, the court concluded that Hamilton "reasonably determined that Conlogue posed an immediate threat to

the troopers when he pointed his gun over their heads, and that no other remedial action was feasible given the tense, rapidly evolving situation and the various failed attempts at de-escalation." Id. at *12. Consequently, the court held that Hamilton was entitled to qualified immunity on the federal claims and subsequently extended that reasoning to justify the dismissal of the state-law causes of action as well. See id. Having laid this foundation, the court granted Hamilton's motion for summary judgment and denied the plaintiff's cross-motion. See id. at *13. This timely appeal ensued.

## II. ANALYSIS

We review an order granting or denying summary judgment de novo. See McKenney v. Mangino, 873 F.3d 75, 80 (1st Cir. 2017), cert. denied, 138 S. Ct. 1311 (2018). The pendency of cross-motions for summary judgment does not alter the standard of review. See Blackie v. Maine, 75 F.3d 716, 721 (1st Cir. 1996). Because the plaintiff challenges only the grant of summary judgment on her federal claims, we limit our analysis accordingly.

Qualified immunity inoculates government officials from civil liability based on their discretionary actions and decisions which, although injurious, "do[] not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). As we have acknowledged, "[t]he doctrine's prophylactic sweep is

- 7 -

broad."  Alfano v. Lynch, 847 F.3d 71, 75 (1st Cir. 2017).  We view claims of qualified immunity through the lens of objective reasonableness.  So viewed, only those officials who should have known that their conduct was objectively unreasonable are beyond the shield of qualified immunity and, thus, are vulnerable to the sword of liability.  See id.

The immunity afforded by this doctrine is particularly important for police officers in order not to "unduly inhibit the assiduous discharge of their dut[y]" to protect the community at large.  Savard, 338 F.3d at 27.  In such cases, the reasonableness calculus "must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary."  Graham v. Connor, 490 U.S. 386, 396-97 (1989).

Where, as here, a defendant invokes the defense of qualified immunity, the necessary analysis is two-pronged.  See McKenney, 873 F.3d at 81.  The court must determine whether the defendant violated the plaintiff's constitutional rights.  See id. It also must determine whether the allegedly abridged right was "clearly established" at the time of the defendant's claimed misconduct.  Id.  Although this description implies a set sequence, these prongs "need not be taken in order."  Alfano, 847 F.3d at 75 (citing Pearson v. Callahan, 555 U.S. 223, 236 (2009)).  A court

is well within its authority to "alter the choreography in the interests of efficiency" beginning — and perhaps ending — with the second prong. Matalon v. Hynnes, 806 F.3d 627, 633 (1st Cir. 2015). So it is here.

The second prong (whether the law was clearly established at the time of the incident) is itself divisible into two inquiries. First, the plaintiff must identify either controlling authority or a consensus of persuasive authority sufficient to put an officer on notice that his conduct fell short of the constitutional norm. See McKenney, 873 F.3d at 81. Second, the plaintiff must show that an objectively reasonable officer would have known that his conduct violated the law. See id. Because many law enforcement encounters arise from confusing, high-stakes circumstances, this second inquiry provides some breathing room for a police officer even if he has made a mistake (albeit a reasonable one) about the lawfulness of his conduct. See Jennings v. Jones, 499 F.3d 2, 19 (1st Cir. 2007) (noting that this inquiry "affords protection to officers who reasonably, yet mistakenly, employ excessive force in violation of the Fourth Amendment").

These two parts of the second prong need not be considered in sequence. After all, an officer seeking qualified immunity may be entitled to its protective shield based solely on the result of the second inquiry. Put simply, even if the

officer's conduct violated a consensus of authority, he remains immune from liability so long as an objectively reasonable officer would not have known that his actions violated the law.

Even if we assume arguendo that Hamilton's action was contrary to a consensus of controlling authority, we are satisfied that an objectively reasonable officer standing in Hamilton's shoes would have thought it appropriate to deploy deadly force against an armed man who, after a nearly three-and-one-half-hour standoff in which he was repeatedly warned to drop his weapon, persisted in pointing a loaded semi-automatic firearm narrowly above the heads of three officers and within easy firing range. We explain briefly.

We recognize, of course, that our analysis "must be particularized to the facts of the case." McKenney, 873 F.3d at 82 (quoting White v. Pauly, 137 S. Ct. 548, 552 (2017) (per curiam)). "Even so, there need not be a case directly on point" for us to draw a conclusion as to the reasonableness of the defendant's conduct. Id. at 82-83. Some general standards serve as useful guideposts.

To begin, the case law makes pellucid that two principal requirements must be satisfied before a police officer can lawfully use deadly force. For one thing, "the use of deadly force is constitutional only if, at a minimum, a suspect poses an immediate threat to police officers or civilians." Jarrett v. Town of

Yarmouth, 331 F.3d 140, 149 (1st Cir. 2003) (per curiam). For another thing, the suspect ordinarily must be warned (at least when a warning is feasible) before a police officer may use deadly force. See McKenney, 873 F.3d at 82. Although there is no standardized script for such a warning, the key is that the warning must be adequate in light of the circumstances then obtaining. See Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 23 (1st Cir. 2005).

In the case at hand, the undisputed facts make it abundantly clear both that it was reasonable for Hamilton to believe that Conlogue was an imminent threat to others and that he was repeatedly warned to drop his weapon. The standoff was prompted by a call for help from Conlogue's wife (the plaintiff), who reported that he was threatening his own life and that he happened to be "very good with guns." The officers who responded were able to confirm a portion of this worrisome account: Conlogue was seated near his parked car with a semi-automatic handgun pointed at his head.

Although Conlogue appeared at this time to be a threat only to himself, the situation soon changed. Conlogue began to stir and Sheehan admonished him to put down his weapon. Conlogue's reply was profane, and he proceeded to retrieve a knife from his car.

The situation continued to deteriorate. Conlogue made gun-like gestures with his hand, pointing at Fiske and two other troopers. He raised three fingers to confirm that he had three men in sight. Sheehan continued to implore Conlogue to disarm, but Conlogue turned a deaf ear to these serial warnings. Next, Conlogue displayed a fully loaded magazine and inserted it into his gun. He then raised the gun, and waved it back and forth, aiming alternately at his own head and at the troopers.

The record makes manifest that Hamilton was keenly aware of the threat that Conlogue posed. So, too, he was aware that Conlogue had been told several times to drop his weapon but had refused to comply. From everything that Hamilton saw and heard, Conlogue was continuing to escalate the confrontation — arming himself with a knife, making threatening gestures, moving closer to the troopers, and pointing his gun in their direction. When Fiske reported that Conlogue was inching closer to the troopers and pointing his gun in their direction, Hamilton heard what he reasonably perceived as fear in Fiske's voice. Hamilton had reason to believe that Fiske himself was at least partially exposed, making Fiske more vulnerable were Conlogue to open fire. After Conlogue failed to heed yet another warning to drop his gun and Fiske announced his growing discomfort, Hamilton fired the fatal shot.

Two other officers later testified that, when Hamilton fired, they too were preparing to shoot. This circumstance was not known to Hamilton and, therefore, could not have been relevant to his decision — but it is certainly relevant to us. In considering whether an objectively reasonable police officer would have used deadly force, the fact that two other police officers on the scene also were about to fire supports the objective reasonableness of Hamilton's decision. See Ciolino v. Gikas, 861 F.3d 296, 304 (1st Cir. 2017) (considering, as part of reasonableness inquiry, contemporaneous perceptions of other officers on the scene).

In our view, these facts compel a finding that Hamilton was entitled to qualified immunity. We cannot say that an objectively reasonable police officer standing in Hamilton's shoes would have thought it a violation of the law to deploy deadly force in these highly charged circumstances. Under these circumstances, Hamilton reasonably perceived Conlogue to be an imminent threat, with no less drastic means of remediation at hand.

The plaintiff resists this conclusion. Although the plaintiff acknowledges the undisputed fact that Hamilton "was told right before firing the shot that [Conlogue] had the gun pointed in the air over the officers' heads," she nevertheless asserts that the use of deadly force was objectively unreasonable. To this end, she argues that Hamilton could not have regarded Conlogue

- 13 -

as a threat to anyone other than himself because Hamilton "had no information [Conlogue] ever pointed the handgun at any of the officers."

This argument is belied by the facts. Conlogue's gun was pointed in the direction of the troopers — and the fact that he was aiming it over their heads is cold comfort. Practically speaking, there is very little difference in the threat level between a gun aimed directly at a person's head and a gun aimed at a forty-five degree angle over the person's head. The plaintiff's argument is also belied by the cases that she cites. Those cases say quite clearly that the use of deadly force may be reasonable if an individual is holding the weapon in a way that threatens others on the scene. See, e.g., Cooper v. Sheehan, 735 F.3d 153, 159 (4th Cir. 2013) (explaining that "deadly force may only be used by a police officer when, based on a reasonable assessment, the officer or another person is threatened with the weapon" (emphasis in original)); id. at 159 n.9 (noting that an armed suspect may pose a threat even without "pointing, aiming, or firing his weapon"); see also Napier v. Town of Windham, 187 F.3d 177, 187-88 (1st Cir. 1999) (concluding that officer need not have gun pointed directly at him in order reasonably to fear danger). It follows, we think, that when the plaintiff suggests that a gun must be pointed directly at an officer in order to be threatening, she is simply wrong.

In a similar vein, the plaintiff suggests that the use of lethal force was objectively unreasonable because Conlogue was never explicitly warned that "he would be shot if he failed to put down the weapon." This suggestion lacks force. When possible, a warning is required before a police officer resorts to the use of deadly force. Here, however, Conlogue received several clear and timely warnings to drop his weapon, and he chose to ignore them. No more was exigible. See Tennessee v. Garner, 471 U.S. 1, 11-12 (1985) (instructing "if the suspect threatens the officer with a weapon . . . deadly force may be used . . . if, where feasible, some warning has been given" (emphasis supplied)). As long as the warning is clear and timely — which was the case here — police officers need not use any particular set of magic words.[3] When — as in this case — a gun is pointed toward officers during a standoff between an armed man and law enforcement, a warning to disarm would seem to imply that deadly force may be used if the warning is not heeded.

Taking a somewhat different tack, the plaintiff suggests that the length of the standoff (approximately three-and-one-half hours) cuts against a finding of reasonableness. We do not agree.

---

[3] This holding is consistent with our decision in McKenney, in which we stated that "some sort of warning" should be given before using deadly force. 873 F.3d at 82. Our decision there did not impose a requirement that the warning specify the consequences of non-compliance, nor do we impose such a requirement today.

Hamilton knew that the police had spent considerable time trying to diffuse the situation, allowing Conlogue ample opportunity to heed their warnings. Yet, Conlogue spurned a series of warnings, and his behavior throughout the encounter was unpredictable, culminating in the pointing of his gun in the direction of officers. Under these circumstances, the length of the standoff does not militate against a finding of objective reasonableness. Cf. Young, 404 F.3d at 23 (finding it unreasonable to shoot a suspect "extraordinarily quickly" without an "adequate warning").

As a fallback, the plaintiff argues that our decision in McKenney is a testament to Hamilton's lack of objective reasonableness. This argument misreads McKenney. There, we considered whether a police officer was entitled to qualified immunity when he fatally shot a suicidal man who was walking slowly in his own driveway, dangling a gun at his side and not pointing it at anyone. See 873 F.3d at 84. The officer deployed deadly force a full six minutes after the decedent ignored a warning to drop his weapon. See id. We found that the officer was not entitled to qualified immunity, basing that conclusion on the particular facts of the case, including the absence of any real threat of imminent harm to others. See id. at 81-83.

The case at hand bears some superficial similarities to McKenney, but the two cases are readily distinguishable. Unlike in McKenney, the gun-wielder's behavior in this case reasonably

- 16 -

could be interpreted as constituting an imminent threat to others. After all, immediately before Hamilton fired, Conlogue pointed his loaded firearm just above the heads of three police officers. Previously, Conlogue had made threatening gestures to these officers, pointing his hand in the shape of a gun at them. Nothing of this sort occurred in McKenney.

There are also important temporal differences between the two cases. In McKenney, six minutes elapsed between when the decedent raised the gun and when he was shot. See id. at 84. In the interim, he had lowered the gun so that it was pointing toward the ground. See id. Here, in contrast, Conlogue raised the gun and pointed it in the troopers' direction only moments before he was shot.

As a counterweight, the plaintiff notes that the McKenney court spoke of the importance of physical proximity to the reasonableness calculus, see id. at 82, and questions what she perceives as a lack of proximity here. Proximity, though, is a relative measurement. Certainly, the presence of a pointed firearm changes the calculation. When an individual is pointing a loaded firearm, anyone within firing range is in proximity to the life-threatening danger.

To say more about the comparison between this case and McKenney would be supererogatory. We conclude, without serious question, that these cases are not fair congeners. Thus, McKenney

- 17 -

in no way bars a finding that Hamilton's actions were objectively reasonable.[4]

Of course, these two cases do share a tragic result — tragic for the person who lost his life, for the family left behind, and for the police officer who fired the fatal bullet. In the last analysis, though, each case is dependent on its own facts. The doctrine of qualified immunity must flex to those tense, uncertain, and often life-threatening situations in which an officer may find himself embroiled. Because there is no principled way we can say that an objectively reasonable officer in Hamilton's position would have known that he was violating the law by deploying deadly force against Conlogue, the district court did not err in cloaking Hamilton in the mantle of qualified immunity.

**III. CONCLUSION**

We need go no further. As we said at the outset, this is a tragic case. But the facts of record make pellucid that the police were faced with a nightmare scenario — a scenario in which an armed and disturbed individual wholly disregarded serial entreaties to disarm and engaged in a course of conduct that

---

[4] We add a coda. In McKenney, we observed that "federal courts have afforded a special solicitude to suicidal individuals in lethal force cases when those individuals have resisted police commands to drop weapons." 873 F.3d at 82. But such solicitude has its limits and it is afforded only to suicidal individuals who "pose no real security risk to anyone other than themselves." Id. Here, Conlogue's actions threatened not only his own life but also — as time went on — the lives of officers on the scene.

gradually elevated the level of threat.  Tension mounted over time, and when the armed individual took actions that placed officers at imminent risk of serious bodily harm, Hamilton — reasonably concluding that no less drastic means of remediation were feasible — fired the fatal shot.  Under the totality of the circumstances, we conclude that the district court's entry of summary judgment in Hamilton's favor on the basis of qualified immunity must be

**<u>Affirmed</u>.**