# United States Court of Appeals
## For the First Circuit

No. 23-1399

SUSAN JOHNSON, individually and on behalf of her minor son B.L.
and on behalf of Derrick Thompson, deceased; JOCELYNE WELCH, as
personal representative of the Estate of Alivia Welch,

Plaintiffs, Appellants,

v.

CITY OF BIDDEFORD; ROGER P. BEAPURE, individually and as Chief
of Biddeford Police Department; EDWARD DEXTER, individually and
as an employee of the Biddeford Police Department,

Defendants, Appellees,

CITY OF BIDDEFORD POLICE DEPARTMENT; MAINE DEPARTMENT OF PUBLIC
SAFETY; JOHN E. MORRIS, individually and as the Commissioner of
the Maine Department of Public Safety; JACOB WOLTERBEEK,
individually and as an employee of the Biddeford Police
Department; JANE DOES,

Defendants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Jon D. Levy, U.S. District Judge]

---

Before

Montecalvo, Lynch, and Rikelman,
Circuit Judges.

---

Kristine C. Hanley, with whom Garmey Law was on brief, for
appellants.
Joseph A. Padolsky, with whom Douglas I. Louison and Louison,

Costello, Condon & Pfaff, LLP were on brief, for appellees.

_____

February 13, 2024

_____

**LYNCH**, **Circuit Judge**.  The district court, on remand from this court's reinstating the case and vacating the judgment earlier entered for the defendants, entered summary judgment on different grounds for defendant police officers and City of Biddeford, Maine.  See Johnson v. City of Biddeford, 665 F. Supp. 3d 82, 89-91 (D. Me. 2023).  The key issue on appeal is whether judgment for Officer Edward Dexter was correctly entered on grounds of qualified immunity against the appellants' claim of violation of substantive due process rights under the enhancement-of-danger prong of the state-created danger test as articulated by this court in Irish v. Fowler, 979 F.3d 65, 75 (1st Cir. 2020).

We affirm, holding a reasonable officer in Dexter's position would not have understood, on the facts here, that he was by his actions and inactions violating any such rights.

**I.**

"As the district court resolved this case at the summary judgment stage, we rehearse the facts in the light most agreeable to the nonmovant (here, the [appellants]), consistent with record support."  DePoutot v. Raffaelly, 424 F.3d 112, 114 (1st Cir. 2005).

Susan Johnson and Derrick Thompson, mother and son, leased an apartment from landlords James Pak ("Pak") and Armit

- 3 -

Pak, which was attached to the Paks' residence in Biddeford. On December 29, 2012, Thompson was outside shoveling snow when Pak came outside and began arguing with him that there were more cars parked in the driveway than was permitted under the rental agreement. During the argument, Pak made gun-shaped hand gestures and said "bang." Johnson, who had videotaped a portion of the argument on her smartphone, directed Thompson to call the police, which Thompson did. Thompson told the dispatcher that his landlord was "freaking out," was making death threats, and had made gestures toward him in the shape of a gun. Thompson, Johnson, and Alivia Welch, Johnson's girlfriend, waited inside the apartment for the police to arrive.

Biddeford Police Officer Edward Dexter responded to the call. Officer Dexter had a WatchGuard recording system which audio recorded his interactions throughout the encounter with the appellants and the Paks.[1] Officer Dexter entered Thompson and Johnson's apartment and began talking with Johnson, Thompson, and Welch. Thompson told Officer Dexter that Pak had screamed at him about the number of cars parked in the driveway and that Pak had told him that he should hit Pak so that Pak could "bury [Thompson]

---

[1] The appellants submitted a transcript to the district court as an "accurate transcription" of the audio recording. The parties have noted some discrepancies between the transcript and the audio recording. Any disagreements between the parties as to particular discrepancies do not affect our holding.

- 4 -

in the snow."  Johnson said that whenever Thompson "comes home, [Pak will] go outside . . . and start[] mouthing off to him . . . . He follows him around the driveway talking to him like that." Thompson said that Pak "[f]ollows [Thompson] around, harassing [him]."  Johnson said, "that guy has something wrong with him," and Thompson said, "He's nuts."

Officer Dexter viewed video footage on Johnson's phone of Pak arguing with Thompson, grabbing his own crotch, and making sexual comments about Thompson.  In the video, Pak says, "Shut your mouth, you piece of trash. . . .  What are you -- Stealing! Living in the apartment, you don't pay rent."  Johnson responds in the video that she did pay her rent.  Johnson told Officer Dexter that Pak had "threatened" her and Thompson.  Thompson said that Pak had "point[ed] his fingers at [Thompson] and goes, Bang.  And then points them at [Johnson] and he says, Bang."  Johnson told Officer Dexter that Johnson's other son, six-year-old B.L., was in a back room in the apartment and that they were trying to "keep [him] away from this."

Thompson said that he had had similar problems with Pak before and that Pak would "wait at [Pak's] door for [Thompson]" and "start[] yelling" when Thompson arrived.  Officer Dexter said, "He's got a beef with you," to which Thompson said, "Yeah." Thompson said that on one occasion, Pak had started yelling at him

when he arrived home, and Thompson "didn't want to deal with it," so he had "walked inside and shut the door on him." Pak had tried following him into the house, but Thompson had "locked the dead bolt so he couldn't come in behind [him]."

Officer Dexter then asked Thompson, "Okay. And at any time, did you actually feel threatened?" Thompson responded, "Not that -- well, not really I mean --" Officer Dexter asked Thompson if he instead felt "obviously . . . more harassed," to which Thompson said, "Yea. . . . I mean, he gets in my face and . . . [p]retty much nudges towards me . . . ."

Officer Dexter asked Thompson what Pak's "biggest issue" was. Thompson said, "The car in the driveway . . . ." Johnson explained that Pak wanted there to be only "two vehicles in the driveway," but that the tenants understood the rental agreement to allow an additional vehicle for visitors.

Officer Dexter told Johnson, Thompson, and Welch that their dispute was a "civil issue," but that "obviously [Pak is] not allowed to cause harassment, threaten, et cetera." Officer Dexter said, "[W]e can obviously speak to him and see what he has to say." Johnson said, "His wife's not home. I think that's the issue." Welch said that Armit Pak "always comes and apologizes to us after he freaks out. She says, Sorry, he just gets worked up. I don't know what to do about it."

Johnson said that Pak had also yelled at them because the tenants had not attended a "mandatory meeting" that morning, which they had been given notice of the previous day. Officer Dexter asked whether Pak was always like that. Johnson said, "Yeah," and Welch said, "He never talks normal. It's always yelling."

Officer Dexter told the appellants that they should stay away from Pak for the remainder of the evening. He said, "[L]et it snow. Don't shovel." He also said that the appellants should video record any further confrontations, and "[d]isengage. Leave the shovel. Come inside. Let him . . . [d]o whatever. . . . [I]f it continues, obviously call us." Officer Dexter asked Thompson, Johnson, and Welch if they had any questions, and they responded that they did not. Officer Dexter then said that he would return after speaking with the Paks.

Officer Dexter knocked on the door of the Paks' residence, and Dexter entered the Paks' residence after Armit Pak invited him in. Officer Dexter had a discussion with Armit, who told him that her husband was angry with Thompson and Johnson because they had broken their lease by, among other things, having an additional car in the driveway. Armit said that she and Pak had served an eviction notice on the appellants. Officer Dexter told Armit that this was "a civil issue between you guys . . . and

- 7 -

there's nothing that we can do about that." Armit said, "I know it." Officer Dexter brought up Pak's earlier altercation with the tenants, to which Armit responded that the issues with the tenants were "frustrat[ing]." Officer Dexter said that he "underst[ood] that, especially when you get a storm like this, you just want to clean the yard." Armit responded, "Yeah."

Pak then entered the conversation. He was angry, agitated, and incoherent at various points during his interaction with Officer Dexter. Pak told Officer Dexter that Thompson had given him the finger and that, in response, Pak had told Thompson, "I have a gun, I shoot you. Bang." Officer Dexter told Pak that he understood Pak was upset, but that even if Thompson had been rude and disrespectful, Pak could not "threaten him that way." Officer Dexter said, "I understand [Thompson's behavior] upsets you. . . . And I can see that it's disrespectful to you. And I see that. And I understand that. Okay? But you can't threaten to physically hurt him. . . . [Y]ou can't threaten to shoot him." Pak said, "I know. I can -- I'd like to shoot him." Officer Dexter said, "Yes, but you can't say those things. . . . Because if you threaten to shoot them, they're going to take you to court. And I'm going to give you a summons to go to court for criminal threatening. You cannot threaten them." Pak said, "I'd like to shoot him -- I'd like to smack him." Officer Dexter responded,

- 8 -

> [B]ut you can't tell them that.  What you need
> to do is turn around and come inside.
>
> And you need to go through the civil process
> of getting them evicted.  It's a difficult
> process.  You have to go through the courts to
> get them evicted.  It's going to be difficult,
> and you guys need to be patient.  That's the
> downside --

Pak said, "She said, [w]e got it recorded.  You say --"  Armit said to Pak, "Jim, calm down."  After further discussion, Pak said, "The lease is broken.  They broke the lease."  Officer Dexter responded,

> Okay. . . . I understand that it's been broken;
> but the problem is, you guys and them signed
> the lease, okay?  You need to go through the
> court process for that.
>
> You can't just threaten to . . . beat him up,
> to shoot him, or things like that.
>
> I understand you're mad.  I understand that.

Pak then raised the issue about the number of cars parked in the driveway.  He said, "He ain't got right to three.  Only two car.  He have three.  Now . . . you say civil.  They got right to any car they want, huh?"  Officer Dexter said, "That's an agreement between you and them. . . .  [T]hey were telling me . . . that they have two, plus if they have visitors they can park on the side or over there.  Okay?"  Armit said, "They're not supposed to have visitors every day."  Officer Dexter responded, "Either way, that's a civil agreement between you and them. . . .  The bottom

- 9 -

line is that you cannot threaten them, okay?  If they're outside shoveling, leave them alone.  Do it through the courts."

Pak said, "I can't believe it's happening."  Officer Dexter responded, "It's frustrating.  I understand that."  Pak said, "I got news though.  I'm glad that you say that I don't have any right.  They got right."  Officer Dexter said,

> That's the downside of being a landlord in this state.  The tenants in this state have so many rights.  It is so frustrating for landlords. . . .  Landlords have a tough time in this state, and I feel sorry for you as a landlord because of the frustration that you're experiencing.  I don't have a good answer for you.

After further comments by Pak, Officer Dexter responded, "[I]f you take their stuff and you throw it out in the snow and it gets damaged, you're going to get charged with criminal mischief.  That's the downside."  Pak said, "Now, we don't have any right, huh?"  Officer Dexter said, "You have to go through the eviction process."  Pak then said, "No, you can't even get . . . the two car parked there -- they got three car."  Officer Dexter said, "I can't do a thing about it, because that's the agreement that you signed, in your lease agreement . . . with them."

Officer Dexter then told the Paks, "Recommendations, okay?  What I suggest tonight is --," and Armit said, "Stay in the house."  Officer Dexter said, "Yeah. . . .  [I]f you want to go out and shovel, do it when they're not there.  Okay?"  Pak said,

- 10 -

"What you mean, . . . I can't shovel?"  Officer Dexter said, "You can shovel.  Do it while they're inside, okay?  If they want to come outside, don't say anything to them.  Just ignore them.  Put the blinders on.  Do your thing.  Let them do their thing."

Pak said, "I ain't got nothing to lose.  I came from orphanage . . . ."  Officer Dexter responded that Pak had a "lot to lose, sir.  You have this house, you have your wife, you have your dog, you have your vehicles. . . .  Just ignore them.  Don't let it get to you.  Okay?"  Pak told Officer Dexter, "He done called me 'Jap.'  He call me names.  And I just . . . don't have any right? . . .  You're gonna see me in the newspaper."  Officer Dexter responded, "No, I don't want to see you in the news."  Pak said, "You're gonna see the newspaper.  I ain't got nothing to lose.  Parking like that, renting apartment house.  They're gonna hear of that tomorrow."  Pak said to Armit, "I'm not going to tell you in front of Officer . . . Dexter."  Officer Dexter responded, "Don't."  Pak told Officer Dexter that he had had "enough" and that the tenants "own [him]," and Dexter responded, "No, they don't."

Pak said, "Please.  When you go . . . down there, . . . [l]east you can say their car can't park in there."  Officer Dexter responded, "I can't tell them that.  It's a civil issue between you guys."  Pak said, "God help you.  Looks like we'll see.  There's

- 11 -

gonna be big name tomorrow." Officer Dexter said, "Don't -- don't make --" Pak said, "No, you let them go free. Everything free." Officer Dexter responded, "No. . . . Okay. I'm going to go now. Keep your distance."

Officer Dexter asked Pak for his birth date, and Pak told him that he was born in 1938. After further discussion between Officer Dexter and Pak about the cars in the driveway, Pak said, "I'm gonna go see them now." Officer Dexter replied, "Keep your distance from them. I'm going to tell them to keep their distance from you." Pak then said, "There gonna be bloody mess."[2]

Officer Dexter did not arrest, detain, or initiate a mental health intervention for Pak, nor did he ask Pak whether he had access to a firearm or whether Pak had been drinking alcohol.

Officer Dexter returned to Johnson and Thompson's apartment. Officer Dexter told Johnson, Thompson, and Welch that he had "explained to [the Paks]" that they should keep their distance. Johnson asked whether Pak was "alone" in his residence, and Officer Dexter answered that Pak's wife was there as well. Officer Dexter said,

---

[2]     It is unclear in the record whether these were the final words spoken by Pak before Officer Dexter left the Paks' residence, or whether they were spoken earlier in the conversation. The appellees contend that Pak's final words before Officer Dexter left were that Dexter didn't "have to worry" after Dexter told him to keep his distance from the appellants. This factual dispute does not affect our holding.

- 12 -

> I explained to them that this is a civil issue. He's obviously extremely upset about the second car and whatnot. O[K]? Use caution. You're out there shoveling, he comes out, come inside. I think at this point in time trying to get him to understand what's happening and the issues of civil issue between you guys . . . is gonna be hard pressed and you guys are gonna have more than one conflict unfortunately.

When Johnson told Officer Dexter that Pak does not listen or understand, Officer Dexter said,

> there's not much I can do about it because it is a civil issue. . . . So whether you guys are going through the eviction process, . . . I can't do much about that. . . . But, I can do things about the harassment[,] et cetera[, and] the threatening.

Johnson asked Officer Dexter whether he was "going back in there at all," to which Officer Dexter responded that he was "done talking with [the Paks]." Johnson told Officer Dexter that Pak sometimes peered into their windows, and Officer Dexter responded, "Pull your shades down." Johnson said that she had seen Pak "standing there looking in the windows before." Officer Dexter said,

> [O]bviously, you have the type of landlord that watches everything you do. Okay? That's what shades and curtains are for. . . . I wish I had a better answer for you. . . . I advised [Pak] he can't harass you, he can't threaten you. Whether it was successful or not I don't know.

Thompson said, "I'll find out soon enough," and Officer Dexter

responded, "Well, just keep your distance."

Thompson and Johnson explained that Pak had threatened to tow their car, to plow snow over it, and to block it in. Officer Dexter told Johnson and Thompson that they should call the police if the Paks caused any damage to their vehicles, because that could constitute criminal mischief. Officer Dexter said, "We'll come in that case; but beyond that -- okay? . . . Stay in for the night."

Johnson asked Officer Dexter, "Was [Pak] acting calm while you were over there?"[3] Officer Dexter replied that "[c]alm is not the best word." Johnson said, "Because . . . I wonder if he's going to be normal." Officer Dexter said, "she's there too," to which Johnson said, "O[K]." Officer Dexter then said, "But they're frustrated. They're frustrated because -- they are hung up on the two-car thing." Officer Dexter said that Armit had "brought up the issue of . . . the meeting." Johnson replied that, because the Paks are her landlords and not her employers, they could not require her to attend a mandatory meeting on short notice. Officer Dexter responded, "I can't," and Johnson said, "I know." Officer Dexter then said goodbye and left the residence.

A few minutes later, Pak walked into Johnson and

_____

[3] There is an indication in the record that Johnson instead said, "Was his wife calm when you went over there?" However, the parties agreed that Johnson asked whether Pak was acting calm. This factual uncertainty does not impact our holding.

Thompson's apartment with a firearm and shot Johnson, Thompson, and Welch.[4] Four minutes after Officer Dexter's departure, 9-1-1 dispatch received a call about a shooting at the apartment. Officer Dexter responded to the call, and upon entering the apartment found Thompson and Welch dead and Johnson seriously injured. Officer Dexter removed Johnson's minor son, B.L., who had not been shot, from the apartment. Johnson survived the shooting but suffered extensive injuries. Pak was arrested that night.

Maine State Police detectives interviewed Pak the next day. Pak told the detectives that he felt that Officer Dexter was "wrong" and that Dexter had told Pak that the tenants "were protected by the constitution." He also said that Officer Dexter had protected the appellants instead of him, and he felt he had no rights and that Dexter had said that the tenants had more rights than he did as a landlord. Pak later pleaded guilty to two counts of homicide and was sentenced to life in prison.

## II.

Johnson -- individually and on behalf of B.L. and Thompson's estate -- and the representative of Welch's estate brought suit against the defendants, including Officer Dexter,

---

[4] The record is silent as to whether the apartment was locked or how Pak was able to enter it.

alleging among other claims that, pursuant to 42 U.S.C. § 1983 and the Maine Civil Rights Act (MCRA), Me. Rev. Stat. Ann. tit. 5, § 4682(1-A) (2001), Dexter had violated the tenants' Fourteenth Amendment substantive due process rights in both his individual and official capacities under the state-created danger doctrine. In April 2020, the district court granted the defendants' motion for summary judgment on all claims. See Johnson v. City of Biddeford, 454 F. Supp. 3d 75, 95 (D. Me. 2020). The court held that the appellants had not established a substantive due process violation under the state-created danger doctrine. See id. at 91-92, 95.

The appellants appealed to the First Circuit. We affirmed the judgment in part and vacated and remanded the grant of summary judgment as to, among other claims, the § 1983 and MCRA claims against Officer Dexter. See Welch v. City of Biddeford Police Dep't, 12 F.4th 70, 78 (1st Cir. 2021). We instructed that "[t]he district court should address on remand whether Officer Dexter is entitled to qualified immunity and may choose to address the second step of the qualified immunity inquiry before addressing whether Officer Dexter violated the [appellants'] substantive due process rights under the state-created danger doctrine." Id. at 77.

Following remand, the remaining defendants filed a

renewed motion for summary judgment. In March 2023, the district court granted summary judgment as to the remaining claims. See Johnson, 665 F. Supp. 3d at 91. The court held that "although a jury could conclude that Officer Dexter violated the tenants' substantive due process rights under the state-created danger doctrine, the state of the law in 2012 would not have given Officer Dexter fair warning that his conduct was unconstitutional," and therefore "qualified immunity protects Officer Dexter." Id. at 121.

The appellants timely appealed.

### III.

### A.

The appellants contend that the district court erred when it granted the appellees' motion for summary judgment on the § 1983 claim against Officer Dexter and that Dexter's conduct is not protected under qualified immunity.[5] We review the court's grant of the appellees' motion de novo. See Penate v. Sullivan, 73 F.4th 10, 17 (1st Cir. 2023). When resolving a qualified immunity claim at the summary judgment stage, we "fram[e] the factual events according to summary judgment's traditional leeway to the nonmoving party's version of events, and then ask[] whether,

---

[5] The appellants do not contest in their briefs the district court's rulings on their other remaining claims.

given that story, 'a reasonable officer should have known that his actions were unlawful.'" Justiniano v. Walker, 986 F.3d 11, 27 (1st Cir. 2021) (quoting Morelli v. Webster, 552 F.3d 12, 19 (1st Cir. 2009)). "The mere fact that the parties espouse differing versions of the truth does not preclude summary judgment on the basis of qualified immunity. What counts is whether the undisputed facts, together with the nonmoving party's version of any disputed facts, suffice[] to remove the shield of qualified immunity." Moses v. Mele, 711 F.3d 213, 216 (1st Cir. 2013).

"Qualified immunity protects government officials . . . from liability when they act under color of state law, and when their actions or decisions, 'although injurious, "do[] not violate clearly established statutory or constitutional rights of which a reasonable person would have known."'" Swartz v. Sylvester, 53 F.4th 693, 698 (1st Cir. 2022) (alteration in original) (quoting Conlogue v. Hamilton, 906 F.3d 150, 154 (1st Cir. 2018)). To address the appellants' argument, we look to the second prong of the qualified immunity analysis, under which the court inquires whether "the right at issue was 'clearly established' at the time of the alleged violation."[6] Est. of Rahim v. Doe, 51 F.4th 402,

---

[6] We do not address whether under the facts alleged Dexter's conduct violated a constitutional right. See Maldonado v. Fontanes, 568 F.3d 263, 270 (1st Cir. 2009) ("Courts have discretion [in qualified immunity analysis] to decide whether, on

410 (1st Cir. 2022) (quoting Conlogue, 906 F.3d at 155).  This inquiry encompasses two separate examinations, each of which must be satisfied in the affirmative for an officer to be found liable for his or her conduct:  First, "[t]he plaintiff must 'identify either controlling authority or a consensus of persuasive authority sufficient to put an officer on notice that his conduct fell short of the constitutional norm.'"  Id. (quoting Conlogue, 906 F.3d at 155).  Second, "[t]he plaintiff must . . . 'show that an objectively reasonable officer would have known that his conduct violated the law.'"  Id. (quoting Conlogue, 906 F.3d at 155).  The purpose of these examinations is to determine "whether the state of the law [at the time of the officer's conduct] gave [him or her] fair warning that [his or her] alleged treatment of [the plaintiff] was unconstitutional."  Lachance v. Town of Charlton, 990 F.3d 14, 20-21 (1st Cir. 2021) (last alteration in original) (quoting Irish, 979 F.3d at 76).  Under the second aspect of the "clearly established" prong, we hold that Officer Dexter was entitled to qualified immunity.

## B.

"[A]n officer is entitled to qualified immunity '[i]f . . . an objectively reasonable officer could have concluded (even

---

the facts of a particular case, it is worthwhile to address first whether the facts alleged make out a violation of a constitutional right.").

mistakenly) that his or her conduct did not violate [the plaintiffs'] rights.'" Stamps v. Town of Framingham, 813 F.3d 27, 34 n.7 (1st Cir. 2016) (second alteration in original) (quoting Mlodzinski v. Lewis, 648 F.3d 24, 28 (1st Cir. 2011)). A court will hold otherwise only if "the unconstitutionality of the officer's conduct [is] beyond debate in light of an existing principle of law." French v. Merrill, 15 F.4th 116, 126 (1st Cir. 2021). This is a "heavy burden" for a plaintiff to meet. Est. of Rahim, 51 F.4th at 410 (quoting Lachance, 990 F.3d at 20). Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." Hunt v. Massi, 773 F.3d 361, 367 (1st Cir. 2014) (internal quotation marks omitted) (quoting Carroll v. Carman, 574 U.S. 13, 17 (2014)).

The appellants argue that an objectively reasonable officer would have known that Officer Dexter's conduct was unlawful under the state-created danger doctrine. The appellants argue that Officer Dexter unlawfully enhanced the danger that Pak posed to the appellants when his conversation with Pak caused Pak to become increasingly agitated. The appellants maintain that Officer Dexter's conduct "shocks the conscience" because he failed to take steps to mitigate the threat posed by Pak. Additionally, the appellants contend that Officer Dexter enhanced the danger to

- 20 -

the appellants when he "downplayed the risk the [appellants] faced from Pak by omitting mention of the specific, immediate and credible threats Pak was making about the [appellants]" and that Pak was in an increasingly agitated state.

This court has held that, for a plaintiff to make a claim in the First Circuit that his or her due process rights have been violated under the state-created danger doctrine,

> the plaintiff must establish:
>
> > (1) that a state actor or state actors affirmatively acted to create or enhance a danger to the plaintiff;
> >
> > (2) that the act or acts created or enhanced a danger specific to the plaintiff and distinct from the danger to the general public;
> >
> > (3) that the act or acts caused the plaintiff's harm; and
> >
> > (4) that the state actor's conduct, when viewed in total, shocks the conscience.
> >
> > > (i) Where officials have the opportunity to make unhurried judgments, deliberate indifference may shock the conscience, particularly where the state official performs multiple acts of indifference to a rising risk of acute and severe danger. To show deliberate indifference, the plaintiff must, at a bare minimum, demonstrate that the defendant actually knew of a substantial risk of serious harm and disregarded that risk.

> (ii) Where state actors must act in a matter of seconds or minutes, a higher level of culpability is required.

Irish, 979 F.3d at 75.

We conclude that a reasonable officer could have concluded at the time that Officer Dexter's conduct did not violate the appellants' constitutional rights under the state-created danger doctrine. Further, reasonable minds could disagree that Officer Dexter's conduct when viewed in total shocks the conscience, and that issue is not "beyond debate." Ciarametaro v. City of Gloucester, 87 F.4th 83, 88 (1st Cir. 2023) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)).

The appellants contend that Pak's demeanor and threatening language towards the appellants during his interactions with Officer Dexter caused Dexter to be aware that Pak posed "an actual, imminent threat" which required further police action. But Officer Dexter reasonably could have believed that there was no imminent threat from Pak requiring further action on Officer Dexter's part. Prior to Officer Dexter's interactions with Pak, Thompson had stated in response to Dexter's questioning that he did not feel threatened by Pak's conduct, but rather only felt harassed. Officer Dexter was also informed that Pak had a history of exhibiting erratic and angry behavior without Pak's engaging in actual violence, and that Pak was seventy-four years

- 22 -

old. In addition, Officer Dexter was told by Johnson that Armit's presence diminished the likelihood of conflict. See Irish, 979 F.3d at 79 (holding that officers were on notice their conduct was unlawful when "they effectively alerted the suspect that he was under investigation in a manner that notified the suspect who the reporting individual was, despite knowing that the suspect was likely to become violent toward that person" (emphasis added)); Kennedy v. City of Ridgefield, 439 F.3d 1055, 1064 (9th Cir. 2006) (holding that officer acted with deliberate indifference where plaintiff had "told [officer] in detail of [third party's] violent tendencies, including several incidents of what can only be described as alarming, aggravated violence").

Further, Officer Dexter reasonably could have believed that his conduct would not create or enhance the danger posed to the appellants. The appellants contend that Officer Dexter showed deliberate indifference to a substantial risk of serious harm when Officer Dexter allegedly "confirmed" to Pak he had "no rights" as a landlord, thereby agitating him. But this is not what the record shows. Officer Dexter repeatedly explained to Pak that he could resolve any disputes with his tenants through the "whole eviction process." The appellants point to Officer Dexter's expressions of sympathy with Pak's plight, such as when Dexter told Pak that "[l]andlords have a tough time in this state, and I feel sorry for

you as a landlord because of the frustration that you're experiencing." But Officer Dexter reasonably could have believed that such conveyances of sympathy would have the effect of calming Pak, rather than agitating him. See Suboh v. Dist. Att'y's Off., 298 F.3d 81, 95 (1st Cir. 2002) ("If the officer's mistake as to what the law requires is reasonable . . . the officer is entitled to the immunity defense." (quoting Saucier v. Katz, 533 U.S. 194, 205 (2001))); Polanco v. Diaz, 76 F.4th 918, 931 (9th Cir. 2023) (holding that officers were not protected by qualified immunity because they "affirmatively expos[ed] their employees to workplace conditions that they knew were likely to cause serious illness" (emphasis added)). Further, Officer Dexter expressed these sentiments alongside statements that Pak could not "threaten to physically hurt" his tenants, and Dexter repeatedly advised Pak to stay away from his tenants. Officer Dexter also told Pak that he had a lot to lose were he to "let the dispute get to him."

The appellants further argue that Officer Dexter enhanced the danger posed by Pak because he "enabled" Pak's belief that he could attack the appellants with impunity. The appellants maintain that Officer Dexter enabled such belief when he told Pak that Pak could not threaten the appellants but did not also tell Pak that he could not act on such threats. But Officer Dexter did make several statements that Pak should restrain himself. Officer

- 24 -

Dexter told Pak that Pak would face legal consequences if he were to damage the appellants' furniture.  Officer Dexter also told Pak repeatedly to stay away from the tenants, that he did not want to see his name in the newspaper, and that he should not let the dispute get to him.  Officer Dexter indicated that Pak should "leave [the tenants] alone," and to resolve any dispute "through the courts."  See Okin v. Vill. of Cornwall-on-Hudson Police Dep't, 577 F.3d 415, 434 (2d Cir. 2009) (holding that officers had fair notice that their conduct was unlawful because they "engaged in a pattern of behavior that unmistakably communicated to [a third party] that should he intend to commit acts of violence . . . , they would do nothing to stop him").

The appellants next argue that Officer Dexter acted unlawfully when he failed to inquire whether Pak had access to a firearm, initiate a mental health intervention, or arrest or summons Pak for a criminal violation.[7]  Officer Dexter's failure

---

[7]     The appellants argued before the district court that General Order 136-96, the Biddeford Police Department's deviant conduct policy, supported their argument that Dexter acted with deliberate indifference when he failed to take Pak into custody.  See Irish, 979 F.3d at 77 ("A defendant's adherence to proper police procedure bears on all prongs of the qualified immunity analysis.").  Although the appellants maintain that the General Order has relevance here, the appellants do not challenge on appeal the district court's conclusion that the order did "not . . . render it beyond debate that Officer Dexter's failure to take Pak into custody was unconstitutional," and so the argument is waived.  See Martínez-Rivera v. Puerto Rico, 812 F.3d 69, 71

to make various inquiries about Pak may have been a serious misjudgment, but this failure was not an affirmative action, and so is not sufficient on its own to establish unlawfulness under the state-created danger doctrine. See Rivera v. Rhode Island, 402 F.3d 27, 34 (1st Cir. 2005). A law enforcement officer does not violate the Due Process Clause merely by "fail[ing] to protect an individual against private violence." Id. (quoting DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 197 (1989)).

The appellants additionally argue that Officer Dexter's statements to the appellants after his conversation with Pak misrepresented the actual risk of danger, and thereby placed the appellants in a more vulnerable position. We do not find in the facts alleged by the appellants any misstatements uttered by Officer Dexter about his interactions with Pak. Officer Dexter informed the appellants that Pak was "obviously extremely upset," told them to avoid contact with him, and expressed uncertainty about whether his conversation with Pak had successfully placated him. See Irish, 979 F.3d at 79 (holding that officers' conduct was clearly unlawful in part because they "fail[ed] to take steps to mitigate the danger they had created and misle[d] the victim about the level of police protection she had"); Kennedy, 439 F.3d

n.2 (1st Cir. 2016) ("[A]rguments 'not developed in a party's opening brief are waived.'" (quoting HSBC Realty Credit Corp. (USA) v. O'Neill, 745 F.3d 564, 577 (1st Cir. 2014))).

at 1065 (holding that officer's conduct was not shielded by qualified immunity under state-created danger doctrine in part because officer "allegedly reassured the visibly frightened [victim] of increased security which was either never provided or plainly ineffective.").

The appellants contend that Officer Dexter caused the appellants to be unaware that Pak had made immediate, direct threats towards their lives when he merely told them to stay away from Pak. But as Officer Dexter knew at the time, Thompson, Johnson, and Welch had already heard Pak violently threaten Thompson, including Pak's statement that he would "shoot" Thompson. Dexter reasonably could have believed that transmitting further graphic details of Pak's threats to the appellants would have only served to escalate the conflict. See Meléndez-García v. Sánchez, 629 F.3d 25, 37 (1st Cir. 2010) ("[E]ven where the government is aware of specific dangers . . . it must perform a triage among competing demands." (omission in original) (quoting Ramos-Piñero v. Puerto Rico, 453 F.3d 48, 54 (1st Cir. 2006))).

### c.

We turn to and reject the appellants' argument that prior caselaw clearly gave Officer Dexter fair warning. See Hope v. Pelzer, 536 U.S. 730, 741 (2002) ("[E]arlier cases involving 'fundamentally similar' facts can provide especially strong

support for a conclusion that the law is clearly established . . . ."). While a factually similar case is not necessary to clearly establish the unlawfulness of an officer's conduct, see Irish, 979 F.3d at 78, the existence of prior caselaw with similar facts can bolster such a claim, see Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018) ("Precedent involving similar facts can help move a case beyond the otherwise 'hazy border between excessive and acceptable force' and thereby provide an officer notice that a specific use of force is unlawful." (quoting Mullenix v. Luna, 577 U.S. 7, 18 (2015))).

Appellants argue that the Ninth Circuit's 2006 decision in Kennedy has a fact pattern similar to this case, and so provided Officer Dexter fair warning. In that case, the plaintiff reported to law enforcement that her neighbor Burns had molested her daughter and that Burns might respond violently if he learned of the allegation. 439 F.3d at 1057-58. The police promised to warn the plaintiff before contacting Burns, but the investigating officer informed Burns's mother of the allegation without warning. Id. at 1058. When the plaintiff expressed a fear that she could be harmed, the officer told her that law enforcement would patrol the neighborhood to keep an eye on Burns, causing the plaintiff to decide to remain in her home that night. Id. There was no patrol, and Burns retaliated by shooting the plaintiff and her husband in

their home.  Id.  The court held that the officer had violated a clearly established constitutional right under the state-created danger doctrine.  See id. at 1067.

Kennedy did not provide such fair warning.  The appellants maintain that Officer Dexter's conduct was similar to that in Kennedy because Dexter endangered the appellants by agitating Pak.  As discussed, however, a reasonable officer could have believed that Officer Dexter's conduct would not enhance the danger posed by Pak, and that Pak did not pose an actual threat.  In contrast, the officer in Kennedy took an affirmative action -- informing Burns's mother of the allegations against him -- that the officer had been expressly warned would endanger the plaintiff.  See id. at 1065 ("Of all the possible actions [the officer] could take, and pursuant to no investigatory duties, he took the one most feared by [the plaintiff].").

The appellants also contend that Kennedy is factually similar because the officer in that case misrepresented the extent of the protection available to the plaintiff, while Officer Dexter misrepresented to the appellants the threat posed by Pak.  Aside from the question of whether Officer Dexter in fact made any misrepresentations to the appellants, we are not convinced that Kennedy is on point.  The officer's misrepresentation in Kennedy enhanced a danger that the officer knew he had created.  Id.

Unlike the conduct at issue in Kennedy, Officer Dexter reasonably could have believed that the omission of graphic details from his retelling of his conversation with Pak was a prudent strategy to avoid further conflict between the parties.  See id. (concluding that the officer "acted deliberately and indifferently to the danger he was creating.").

The appellants additionally argue that Officer Dexter had fair warning due to the Seventh Circuit's decision in Monfils v. Taylor, 165 F.3d 511 (7th Cir. 1998).  The officer in Monfils failed to prevent the release of a tape recording that revealed an employee had accused his co-worker of theft, despite the officer's assurances to the employee and an assistant district attorney that the recording would remain unreleased on account of the employee's fears of violent retaliation.  165 F.3d at 513-15.  Following release of the tape, the employee was killed by several of his co-workers.  Id. at 515.  The court held that the officer was not shielded by qualified immunity because the officer "took responsibility for preventing the release of the tape," but then did not follow through despite having "information in his possession indicat[ing] that the tape should not be released." Id. at 519-20.  The officer's false assurances that he would prevent release of the tape "created a danger [the employee] would not otherwise have faced."  Id. at 518.

Officer Dexter did not take actions comparable to those taken by the officer in Monfils. The officer in Monfils had express warning that release of the tape recording would endanger the plaintiff. See id. at 520 (holding that the officer "knew of the increased danger" from releasing the tape). Officer Dexter, by contrast, reasonably could have believed that his interactions with the Paks would not create or enhance a danger to the appellants. Moreover, Officer Dexter did not make any false or misleading assurances to the appellants about the extent of protection they would receive. Monfils therefore did not provide fair warning to Officer Dexter.[8]

---

[8] The appellants cite two district court cases, each of which were decided after the challenged conduct here, in support of their argument that Kennedy and Monfils provided fair warning to Officer Dexter. According to the appellants, both of these opinions "rely on prior Ninth Circuit jurisprudence in holding that the officers were fairly on notice that their conduct violated the plaintiffs' substantive due process rights." Neither of these district court cases, however, involves a qualified immunity defense, and so they do not address the issue of whether the officers were fairly on notice. See Mackie v. Cnty. Of Santa Cruz, 444 F. Supp. 3d 1094 (N.D. Cal. 2020); McClammy v. Halloran, No. 18-68-GF, 2019 WL 4674462 (D. Mont. Sept. 25, 2019). Accordingly, neither of these cases has persuasive value here. Moreover, the Ninth Circuit decisions that these cases rely upon involve substantially different fact patterns than the one before us. McClammy, as the appellants recognize, "relie[d] only on Kennedy for the proposition that the state-created danger theory [was] viable in [that case's] fact-pattern." As we discussed, Kennedy did not provide Officer Dexter fair warning. The court in Mackie relied upon three Ninth Circuit cases that each involve fact patterns where officials took affirmative steps that indisputably placed the plaintiffs in a more dangerous situation than the one

- 31 -

Officer Dexter, in speaking with Pak but failing to make various inquiries such as whether Pak had access to a firearm, may have made a serious misjudgment.  The qualified immunity defense, however, "demands deference to the reasonable, if mistaken, actions of the movant."  Justiniano, 986 F.3d at 27 (quoting Morelli, 552 F.3d at 18-19)).  A reasonable officer could have understood Officer Dexter's conduct to be consistent with the constitution, and so he is entitled to qualified immunity.

**IV.**

We affirm the grant of summary judgment on all claims.

---

in which the officials found them.  See Munger v. City of Glasgow Police Dep't, 227 F.3d 1082, 1085, 1087 (9th Cir. 2000) (describing that patron died of hypothermia after "officers affirmatively ejected [him] from a bar late at night when the outside temperatures were subfreezing," and then "prevented [him] from driving his truck or reentering [the bar]," despite their knowledge that he "was wearing only a t-shirt and jeans[ and] was intoxicated"); L.W. v. Grubbs, 92 F.3d 894, 895-96 (9th Cir. 1996) (describing that prison official approved known sex-offender inmate to work with female prison nurse, despite previously having been told not to allow the inmate to work one-on-one with any women, and that the inmate then attacked and attempted to rape the nurse); Wood v. Ostrander, 879 F.2d 583, 586, 590 (9th Cir. 1989) (describing that the plaintiff was raped after officer "impounded [her] car, and apparently stranded [her] in a high-crime area at 2:30 a.m.").  Here, Officer Dexter took no such affirmative action.